[This decision has been published in *Ohio Official Reports* at 93 Ohio St.3d 628.]

DEROLPH ET AL., APPELLEES, *v.* THE STATE OF OHIO ET AL., APPELLANTS.

[Cite as *DeRolph v. State*, 2001-Ohio-1896.]

*Constitutional law—Education—Schools—School-funding formula—Motion to reconsider DeRolph III—Motion to reconsider granted–Matter referred to settlement conference presided over by master commissioner pursuant to S.Ct.Prac.R. XIV(6)(A) before court's ruling on merits of arguments in motion for reconsideration.*

(No. 99-570—Submitted October 30, 2001—Decided November 16, 2001.)

ORDER on Motion for Reconsideration.

**MOYER, C.J.**

{¶ 1} This matter is before us on a motion for reconsideration filed by defendants-appellants, the state of Ohio, the Ohio Board of Education, the Ohio Superintendent of Public Instruction, and the Ohio Department of Education (collectively referred to as "the state"). In its motion, the state first asserts that the changes to the base cost formula ordered by the court in *DeRolph v. State* (2001), 93 Ohio St.3d 309, 754 N.E.2d 1184 ("*DeRolph III*"), "may have been based in part upon erroneous calculations and data." It urges the court to reconsider our holding that wealth screens may not be used in the state's school-funding foundation formula, and argues that "[t]he use of wealth screens is standard practice throughout school finance and the discipline of statistics generally." The state further asks us to reconsider our order in *DeRolph III* that any funding increases implemented in compliance with that decision be made retroactive to July 1, 2001.

{¶ 2} We have granted the motion to reconsider our decision in *DeRolph III*. However, before ruling on the merits of the arguments presented in the motion

for reconsideration, we refer this matter to a settlement conference to be presided over by a master commissioner pursuant to S.Ct.Prac.R. XIV(6)(A).[1]

{¶ 3} This court has supported and promoted mediation since at least 1989, when the court formed the Committee on Dispute Resolution. On July 7, 1999, we adopted S.Ct.Prac.R. XIV(6), which authorizes the court to refer cases to a settlement conference, at which a master commissioner presides. In practice, the master commissioner often serves as a mediator.

{¶ 4} Adoption of S.Ct.Prac.R. XIV(6) was consistent with Ohio's national reputation as a leader in promoting mediation and other forms of alternative dispute

---

1. S.Ct.Prac.R. XIV(6)(A) provides as follows:

"(A) Referral of Cases for Settlement Conferences.

"The Supreme Court may, *sua sponte* or on motion by a party, refer to a master commissioner for a settlement conference any case that originated in the court of appeals, any appeal from an administrative agency, any original action, or any non-felony case that the Supreme Court deems appropriate. The master commissioner may conduct the settlement conference in person or by telephone. At the settlement conference, the parties shall explore settling the case, simplifying the issues, and expediting the procedure, and may consider any other matter that might aid in resolving the case.

"(B) Attendance.

"If a case is referred for a settlement conference, each party to the case, or the representative of each party who has full settlement authority, and the attorney for each party shall attend the conference, unless excused, in writing, by the master commissioner to whom the case has been referred. If a party or an attorney fails to attend the conference without being excused, the Supreme Court may assess the party or the attorney reasonable expenses caused by the failure, including reasonable attorney fees or all or a part of the expenses of the other party. The Supreme Court may also dismiss the action, strike documents filed by the offending party, or impose any other appropriate penalty.

"(C) Extension of Time to File Briefs.

"On motion by a party, the Supreme Court may, notwithstanding Section 3(B) of this rule, extend filing deadlines or stay the referred case if the extension or stay will facilitate settlement. A request for an extension of time shall be filed with the Clerk within the time prescribed by the rules for filing the brief or other document that is the subject of the request.

"(D) Confidentiality.

"Unless disclosable by the order entered under Section 6(E) of this rule, statements uttered during the settlement conference are confidential. Unless all participants consent to disclosure, no one, including the master commissioner, a party, or a party's attorney, shall disclose any statement uttered in a settlement conference to the Supreme Court. The Supreme Court may impose penalties for any improper disclosure made in violation of this provision.

"(E) Settlement Conference Order.

"At the conclusion of the settlement conference, the Supreme Court will enter an appropriate order."

resolution. Ohio's leadership in recognizing the benefits of alternative dispute resolution has been evident throughout the state, particularly in the judicial branch. Moreover, the General Assembly and Ohio governors have actively supported the adoption of mediation programs.

{¶ 5} For example, in 1989, the General Assembly established, by R.C. 179.02, the Commission on Dispute Resolution and Conflict Management to act as a resource for Ohioans for the development of "constructive, nonviolent forums, processes, and techniques for resolving disputes." Commission on Dispute Resolution and Conflict Management, <http://www.state.oh.us/cdr>. The commission focuses on educational institutions, state and local government, courts, and communities, and provides conflict-management training, consultation and technical assistance in designing dispute-resolution programs, and facilitation and mediation services. *Id.* In the public-policy arena, the commission has dealt with issues as varied as regulatory rulemaking, welfare reform, and environmental enforcement.

{¶ 6} Across the country, court-ordered mediation has been successful, in whole or in part, in resolving education and other public-policy disputes of a complex nature—including disputes that have been mired in litigation for years.

{¶ 7} In *Minneapolis Branch of the NAACP v. Minnesota* and *Xiong v. Minnesota* (2000*)*, Hennepin Cty. Dist. Ct. Nos. 95-14800 and 98-2816, consolidated, unreported, the plaintiffs argued that Minnesota's educational policies precluded children living in areas of concentrated poverty in Minneapolis from receiving an adequate education. Anne O'Connor, NAACP, State Settle Lawsuit over Educational Quality for City Children, Minneapolis-St.Paul Star Tribune (Mar. 14, 2000), at <http://www.startribune.com>. See Appendix.

{¶ 8} Through court-encouraged mediation, the parties and other necessary educational entities reached agreement, resolving the dispute by establishing a four-year program to give Minneapolis families more options for sending their students

to public schools in suburban districts and by directing the state to implement a report card system for each school. *Id.*

{¶ 9} Urban school districts in Baltimore County, Maryland; Dayton, Ohio; and Washington, D.C., have avoided litigation by bringing diverse groups of students, parents, and other citizens together to resolve issues relating to values education and school-change programs. Michael A. Rebell & Robert L. Hughes, Schools, Communities, and the Courts: A Dialogic Approach to Education Reform (1996), 14 Yale L. & Policy Rev. 99, 117-118. In addition, school districts in Harpersville, New York, and Bolivar-Richburg, New York, have used alternative dispute-resolution techniques to resolve controversies over sex education and consolidation of school districts. *Id.*

{¶ 10} Complex environmental disputes have also been successfully mediated. For example, in an early case, the United States Army Corps of Engineers proposed building a dam on the Snoqualmie River in Washington to deal with devastating flooding in the region. Mediation in 1974 resulted in an agreement that provided for a smaller dam at a different site and established a committee to coordinate planning for the region. Michelle Ryan, Alternative Dispute Resolution in Environmental Cases: Friend or Foe? (1997), 10 Tul.Envtl.L.J. 397, 399, fn. 4; Gail Bingham, ADR Procedures: Variations on the Negotiation Theme (1998), SC56 ALI-ABA 265, 294. All parties hailed this as an important victory for mediation of environmental disputes. Ryan, *supra*, 10 Tul.Envtl.L.J. at 399, fn. 4. Similarly, mediation successfully resolved the seventeen-year Storm King Mountain dispute over the use of the Hudson River for power production. Ryan, *supra*, 10 Tul.Envtl.L.J. at 400-401. The utility company, Consolidated Edison Company of New York, agreed to forfeit its license and to transfer the site to an interstate park commission. *Id.* In addition, all utility companies in the region agreed to methods that would protect the river's aquatic life. *Id.* In exchange, all proceedings among the parties ceased. *Id.*

**{¶ 11}** Moreover, as this opinion is being written, long-lived antitrust litigation between the United States and Microsoft is being mediated pursuant to a court order.

**{¶ 12}** With respect to the cause now before us, we recognize that the complex legal, political, public-policy, and administrative issues in *DeRolph v. State* have presented perhaps the most difficult challenge to the Ohio judiciary, including this court, in the ten years since the case was filed, and to the General Assembly and the executive branch, including two Governors. To the best of our knowledge, the parties to this protracted litigation have never met in an attempt to resolve its difficult issues. A majority of this court believes that the time is ripe for the parties, who together represent a comprehensive cross-section of the interests affected by this litigation, to meet and attempt to reach settlement with the assistance of a mediator experienced in resolving public-policy disputes.

**{¶ 13}** We are fully aware that we cannot order the parties to settle: we can only order the parties to accept the opportunity that we are providing to facilitate serious, realistic efforts to finally resolve the issues that separate them. If mediation does not produce settlement, we will assume our responsibility to finally resolve the matter.

**{¶ 14}** A motion for reconsideration has been granted by the court. Both sides acknowledge in their memoranda in support of and opposition to the motion for reconsideration that the evidence and one of the briefs filed in *DeRolph III* contained inaccurate analysis regarding the cost of funding the base cost formula with wealth screens eliminated.

**{¶ 15}** It is clear from *DeRolph III* that the justices in the majority coalesced in a consensus to resolve this long-lived litigation, even while each justice acted with reservations. No one, including the justices of this court, can predict the ultimate decision we might reach when reviewing the merits of *DeRolph III* on reconsideration. As in so many cases, the parties may well find that mediation is

the best hope for obtaining results acceptable to all while avoiding untold expense and the continued uncertainty of going forward.

{¶ 16} We order as follows:

I

Settlement Conference Ordered

{¶ 17} Pursuant to S.Ct.Prac.R. XIV(6), the court refers to a master commissioner the issues raised in defendants-appellants' motion for reconsideration and any other issues that the parties and the mediator deem appropriate issues for mediation. The parties identified below are ordered to appear, through their counsel, at settlement conferences as set forth below. The cause is stayed pending completion of the settlement conferences.

II

Parties

{¶ 18} For purposes of S.Ct.Prac.R. XIV(6), the parties are identified in accordance with the amended complaint filed in this action in 1991 as follows:

*Plaintiffs-appellees*:

> Dale R. DeRolph et al.

*Defendants-appellants*:

> The state of Ohio ("through the Ohio General Assembly"),[2]

> The Ohio Board of Education,

> The Ohio Superintendent of Education,

> The Ohio Department of Education.

---

2. The first amended complaint for declaratory and injunctive relief, filed in the Court of Common Pleas of Perry County, case No. 22043, at 8, alleged, "Defendant State of Ohio, *through the Ohio General Assembly*, is required to provide for a system of public education in the State of Ohio in accordance with the Constitution and laws of the State of Ohio." (Emphasis added.)

By alleging the state of Ohio via the Ohio General Assembly, plaintiffs-appellees effectively made all members of the General Assembly defendants. President of the Ohio Senate Richard H. Finan and Ohio Speaker of the House Larry Householder have appeared in this court in support of the state, and members of the minority party in the Ohio House of Representatives and the Ohio Senate have appeared collectively in support of plaintiffs-appellees.

**{¶ 19}** Although the complaint did not name the Governor of Ohio as a defendant, as a practical matter, statutory change is effected by the General Assembly with the active participation of the Governor. Governor Bob Taft has appeared in this action and filed an *amicus curiae* brief. Of course, legislation may be enacted without the concurrence of the Governor when the General Assembly overrides a Governor's veto, or where a bill presented to the Governor for signature is neither signed nor returned to the General Assembly within ten days. Section 16, Article II, Ohio Constitution. However, Governor Bob Taft clearly has conducted himself as an interested party and may participate as if he were a named party for purposes of the settlement conference. We therefore invite Governor Taft to participate as a party for purposes of the settlement conference.

III

Counsel

**{¶ 20}** For purposes of S.Ct.Prac.R. XIV(6), counsel for the parties are initially identified as follows:

*Plaintiffs-appellees*:

Nicholas A. Pittner, Bricker & Eckler, L.L.P., counsel of record for the plaintiffs-appellees;

Ben E. Espy, Ben Espy Co., L.P.A., counsel for *amici curiae* members of the minority party of the Ohio House of Representatives and the Ohio Senate, collectively.

*Defendants-appellants*:

Assistant Attorney General Mary Lynn Readey, counsel of record for the state of Ohio, the Ohio Board of Education, the Ohio Superintendent of Public Instruction, and the Ohio Department of Education;

N. Victor Goodman, Benesch, Friedlander, Coplan & Aronoff, counsel for Richard H. Finan, President of the Ohio Senate, and Larry Householder, Speaker of the Ohio House of Representatives; and

John J. Chester, Chester, Wilcox & Saxbe, counsel for Ohio Governor Bob Taft.

IV

Appointment of Master Commissioner

**{¶ 21}** The court will select and appoint a master commissioner according to the following procedure:

**{¶ 22}** (A) The following persons, none of whom lives or regularly does business in Ohio, are identified by the court as candidates for master commissioner:

Howard S. Bellman, 123 East Main Street, Madison, WI 53703;

Patrick Field, Consensus Building Institute, 131 Mt. Auburn Street, Cambridge, MA 02138;

Professor Eric D. Green, Boston University School of Law and Resolutions, Inc., 765 Commonwealth Avenue, Boston, MA 02215;

Michael K. Lewis, ADR Associates, LLC, 1666 Connecticut Avenue, NW, Washington, D.C. 20009;

Judy Mares-Dixon, CDR Associates, 100 Arapahoe Avenue, Suite 12, Boulder, CO 80302;

Professor Francis McGovern, Duke University School of Law, Durham, NC 27708;

Roberta Cooper Ramo, Modrall, Sperling, Roehl, Harris & Sisk, P.A., PO Box 2168, Albuquerque, NM 87103

Linda R. Singer, ADR Associates, LLC, 1666 Connecticut Avenue, NW, Washington, D.C. 20009;

Professor Lawrence Susskind, Massachusetts Institute of Technology, 77 Massachusetts Avenue, Cambridge, MA 02139.

**{¶ 23}** Each of these persons has expressed an interest in being named master commissioner.

**{¶ 24}** (B) The parties may, within ten days of this order, submit to the court a memorandum not to exceed five pages in length, containing comment on, or challenges for cause to, the appointment of any of these master commissioner candidates.

**{¶ 25}** (C) Within ten days of this entry, and upon agreement of counsel for all parties, counsel may submit the name of any person to be considered for appointment in addition to the candidates designated in IV(A) of this entry.

**{¶ 26}** (D) The court, upon due consideration of the qualifications of the candidates and the comments of the parties, will appoint the master commissioner, whose duty will be to facilitate serious, active settlement negotiations among the parties.

V

Settlement Conferences

**{¶ 27}** Upon appointment by the court, the master commissioner shall schedule and conduct the settlement conferences, which may continue from day to day in the discretion of the master commissioner.

**{¶ 28}** At the first meeting, the parties shall attempt to develop an agreement governing the mediation process. The agreement may include the following: the scope of the mediation, the process to be followed in the event of partial agreement or impasse, and whether additional discovery will be available as part of the mediation process.

**{¶ 29}** The master commissioner shall schedule additional meetings and thereafter file with the court an anticipated timeline for completion of the settlement conferences.

**{¶ 30}** The master commissioner shall have authority, with notice to the parties, to contact persons outside the mediation process to obtain information, including experts as needed.

VI

Reports to the Court

**{¶ 31}** The master commissioner shall report to the court no later than fifteen days from the first meeting with counsel regarding progress toward settlement.

**{¶ 32}** The master commissioner shall issue a final report to the court within six weeks from the filing of the initial report, unless the master commissioner has requested and received additional time from the court in which to file a final report.

**{¶ 33}** The reports to the court will not include substantive matters.

## VII

### Settlement Conference Order

{¶ 34} Pursuant to S.Ct.Prac.R. XIV(6)(E), the court will enter an appropriate order at the conclusion of the settlement conferences. Upon failure of the parties to reach settlement within a reasonable period of time to be determined by the court, the court will proceed to dispose of the case on reconsideration.

## VIII

### Confidentiality

{¶ 35} Pursuant to S.Ct.Prac.R. XIV(6)(D), statements uttered during the settlement conferences are confidential. In addition, the court finds that R.C. 2317.023,[3] governing nondisclosure of mediation communications, is applicable to the settlement conferences.

---

3. R.C. 2317.023 provides:
  "(A) As used in this section:
  "(1) 'Mediation' means a nonbinding process for the resolution of a dispute in which both of the following apply:
  "(a) A person who is not a party to the dispute serves as mediator to assist the parties to the dispute in negotiating contested issues.
  "(b) A court, administrative agency, not-for-profit community mediation provider, or other public body appoints the mediator or refers the dispute to the mediator, or the parties, engage the mediator.
  "(2) 'Mediation communication' means a communication made in the course of and relating to the subject matter of a mediation.
  "(B) A mediation communication is confidential. Except as provided in division (C) of this section, no person shall disclose a mediation communication in a civil proceeding or in an administrative proceeding.
  "(C) Division (B) of this section does not apply in the following circumstances:
  "(1) Except as provided in division (H) of section 2317.02 and division (C) of section 3109.052 of the Revised Code, to the disclosure by any person of a mediation communication made by a mediator if all parties to the mediation and the mediator consent to the disclosure;
  "(2) To the disclosure by a person other than the mediator of a mediation communication made by a person other than the mediator if all parties consent to the disclosure;
  "(3) To the disclosure of a mediation communication if disclosure is required pursuant to section 2921.22 of the Revised Code;
  "(4) To the disclosure of a mediation communication if a court, after a hearing, determines that the disclosure does not circumvent Evidence Rule 408, that the disclosure is necessary in the particular case to prevent a manifest injustice, and that the necessity for disclosure is of sufficient magnitude to outweigh the importance of protecting the general requirement of confidentiality in mediation proceedings.

IX

Costs

**{¶ 36}** Fees and expenses of the master commissioner, as authorized by the court, will be charged as costs to be divided equally by the parties.

*So ordered.*

DOUGLAS, PFEIFER and LUNDBERG STRATTON, JJ., concur.

DOUGLAS, J., concurs separately.

RESNICK, J., dissents.

F.E. SWEENEY, J., dissents.

COOK, J., dissents.

––––––––––––––––––

**DOUGLAS, J., concurring.**

**{¶ 37}** I concur in the judgment of the majority. I write to make just three points.

I

**{¶ 38}** Justice Resnick's dissent herein seems to preclude consideration in mediation of the issues of overreliance on local property taxes and a complete systematic overhaul of our state's school-funding system. I do not agree, and in fact I voted for reconsideration so that these very issues could be raised in yet another forum in an attempt to make right what has, for so long now, been wrong. As the majority opinion makes clear, "the court refers to a master commissioner the issues raised in defendants-appellants' motion for reconsideration *and any other issues that the parties* and the mediator deem appropriate issues for mediation."

---

"(D) This section does not prevent or inhibit the disclosure, discovery, or admission into evidence of a statement, document, or other matter that is a mediation communication but that, prior to its use in a mediation proceeding, was subject to discovery or admission under law or a rule of evidence or was subject to disclosure as a public record pursuant to section 149.43 of the Revised Code. This section does not affect the admissibility of a written settlement agreement signed by the parties to a mediation or the status of a written settlement agreement as a public record under section 149.43 of the Revised Code."

(Emphasis added.) Neither side or their various supporters have been shy thus far in presenting and arguing their positions. The plaintiffs have consistently argued, and I have agreed and continue to agree, that what is necessary is a complete overhaul of the funding system including an end to heavy reliance on local property taxes. There is no reason to suspect that in mediation they would become any less forceful in seeking their goals.

II

{¶ 39} There has been much discussion and reporting concerning the dollar figure that *DeRolph III* requires. In the defendants' motion for reconsideration they say: "The State seeks reconsideration in the interests of using good numbers and good math. As we have learned, the Court's changes may have been based in part upon erroneous calculations and data." While this statement by the state may be at least partly accurate, it is now time for the whole story to be told on this issue.

{¶ 40} On January 25, 2001, this court ordered that "the parties file any evidence they intend to present as early as practicable but no later than June 15, 2001." *DeRolph v. State* (2001), 91 Ohio St.3d 1225, 741 N.E.2d 533. Implicit in that order was the notion of discovery pursuant to the Civil Rules. Plaintiffs sought discovery, and the defendants refused to cooperate. Plaintiffs filed a motion to compel, and it was necessary for this court to order the defendants to comply with the Rules—the same as any other parties involved in litigation. That order was entered on May 11, 2001. *DeRolph v. State* (2001), 91 Ohio St.3d 1274, 747 N.E.2d 823. That date was just a few weeks before oral argument was scheduled to be heard on June 20. *DeRolph v. State* (2001), 91 Ohio St.3d 1225, 741 N.E.2d 533.

{¶ 41} The record before us reveals that the Ohio Department of Education's Office of Policy Research and Analysis generated, and apparently issued, a revised and more comprehensive document dated May 2, 2001, that contains all of the districts identified as model districts in the fiscal year 1999 with the per-pupil base cost deflated by factors ranging up to eighteen percent and

alternately by factors only up to 7.5 percent. Likewise, the Legislative Service Commission generated a document, also dated May 2, 2001, that contains additional information that is necessary to accurately determine the base cost of the one hundred twenty-seven model districts. Had these documents or the underlying data upon which they are based been timely made available to the plaintiffs, Russell Harris, whose affidavit both parties now acknowledge contains errors, would have been advised and there would have been no confusion over the issue of which figures were accurate.

{¶ 42} The state, having thwarted the plaintiffs' attempts at discovery of the information relied upon by the state in preparing the education budget, now wants to assert that we, the court, were given inaccurate information, that our math skills are poor, and that we were confused. The state does not come with clean hands.

{¶ 43} As to the dollar figure involved in *DeRolph III*, I want to make clear that I knew that over the current and next biennium the additional funds required, including parity aid, would approach $2 billion and in our deliberations I so stated. For anyone willing to do the math, my concurring opinion in *DeRolph III* bears this out. *Id.*, 93 Ohio St.3d at 332-334, 754 N.E.2d at 1206-1209 (Douglas, J., concurring).

{¶ 44} I also knew, however, that that amount, or even the $300 to $500 million that some seem to think was being ordered, was not within the reach of the General Assembly to allocate either because of the lack of funds or the unwillingness to do so. It was my hope then that the order would instead move the General Assembly to bring about the systematic overhaul and restructuring required by *DeRolph I* and *DeRolph II*.

### III

{¶ 45} The state has filed, and we have granted, a motion to reconsider our decision in *DeRolph III*. With the vote on reconsideration *all* members of the court have, at one time or another, now been in the majority on one or more phases of the

14

case. This in itself is curious, but I will leave it to others to speculate why, for each of the seven of us, that has occurred.

{¶ 46} It is also curious that one of the dissenters, who seems to say that *DeRolph III* is the worst case in the history of civil jurisprudence, votes not to reconsider or even to give the parties a chance to work out their differences. This is also true of the plaintiffs, who, in their memorandum opposing reconsideration, say that "[t]he court's 'compromise' leaves the overarching unconstitutionality of the funding system intact and the promise of *DeRolph I* and *DeRolph II*—and the Ohio Constitution—unfulfilled" and that "plaintiffs renew their request to the Court to condemn once and for all this irrational methodology and again require the State, as the Court did in *DeRolph I* and *II*, to develop a funding system that will assure all of Ohio's public school students the resources and educational opportunities they need to compete and succeed in the twenty-first century." Having so eloquently stated their position, the plaintiffs then urge us *not* to reconsider. At best, the message sent is utterly confusing.

IV

{¶ 47} I concur in the order of mediation. I fervently hope that such a procedure will resolve the issues. If, however, that does not happen and the case is returned to our active docket it will, I believe, be up to those who say that *DeRolph III* is so bad to fashion a decision and opinion that can garner the four votes necessary to take the next step.

_____

**ALICE ROBIE RESNICK, J., dissenting.**

{¶ 48} I am compelled to take a position adverse to that of today's majority. This is not because I oppose mediation of this dispute, but because I believe that the timing of the majority's order is incongruous. To be mediating this matter at this time signifies only that the schoolchildren of Ohio have suffered yet another

loss.  Once again, the state's educational system is faced with the prospect of further tweaking, while the fundamental changes to the overall system will be lacking.

{¶ 49} As this court has emphatically pointed out several times, our state's school-funding system has been plagued by an overreliance on local property taxes throughout this litigation.  This dependence continues unabated and remains the key obstacle to the system being transformed into one that is thorough and efficient.  The situation is further exacerbated by the recent downturn of the economy.  The state is without additional funds to distribute to school districts unless it once again cuts funds for other much-needed and deserving programs, such as higher education.

{¶ 50} Today's majority opinion reiterates that, as this court announced on November 2, 2001, a majority of this court has agreed to grant the state's motion for reconsideration of the decision in *DeRolph v. State* (2001), 93 Ohio St.3d 309, 754 N.E.2d 1184 ("*DeRolph III*").  The justices who composed the court's majority in that decision, concluding that "no one is served by continued uncertainty and fractious debate," openly acknowledged that they had united in consensus primarily to (ironically) terminate this court's role in this ongoing dispute.  *Id*. at 311, 754 N.E.2d at 1190.  Thus, the majority decision in *DeRolph III* was more of a political compromise than a true judgment on the merits of the remedial legislation enacted by the state in response to our earlier decisions in this matter.  Instead of issuing a judgment in *DeRolph III*, the majority in effect forced a pragmatic compromise on the parties, even though the parties had sought no such compromise.

{¶ 51} In my dissent in *DeRolph III*, I questioned whether such a resolution of the case was within the scope of this court's authority, and also questioned the wisdom of the majority's mandated solution.  *Id.*, 93 Ohio St.3d at 344-375, 754 N.E.2d at 1216-1241.  As today's pronouncement by the majority demonstrates, it is evident that the majority opinion in *DeRolph III* was just another chapter in the

ongoing saga of this case, and was not the end-all of this litigation that the majority fervently had hoped it would be.

{¶ 52} Its own compromise solution apparently having failed, the majority now turns to mediation as the next hopeful alternative for resolution of this controversy. I would join all members of this court in being pleased if mediation would indeed succeed, and I do not wish to be pessimistic about the prospects of mediation. However, I must point out that there are characteristics of this case that raise serious questions regarding whether mediation presents a realistic prospect for a truly satisfactory conclusion to this dispute. If there is no practical possibility that mediation can lead the parties to a settlement of this dispute, the majority's order does little more than delay the inevitable return of this matter to the forefront of our attention.

{¶ 53} I do not disagree with the majority's general statements on the value of mediation. Mediation has been employed with great success in resolving a wide range of disputes, including leading parties in some extremely complex cases to settle their differences before litigation was resorted to. It is possible that mediation could have been employed in the early years of this litigation, perhaps when this case first was filed in common pleas court in 1991. Mediation may have even been useful when this case was first argued before this court. However, as this litigation has proceeded, and as the various remedial plans have been enacted by the General Assembly and found to be deficient by this court, the parties have seemed to become less and less inclined to compromise. Today the parties on each side are firmly entrenched in their positions. The state is financially strapped and the plaintiffs are in need of greater expenditures if a remedy that satisfies our Constitution is to be obtained.

{¶ 54} While I do not oppose the concept of mediation, I do oppose the way the majority has, with its decision in *DeRolph III* and its order today, established the overall climate in which mediation will be conducted. Throughout the entire

course of this case, it has been clear to me that only a complete systematic overhaul of our system of funding schools can bring our educational system in compliance with our constitutional mandate of a "thorough and efficient system of common schools," Section 2, Article IV, and I have consistently held that position. Absent a complete overhaul, even an injection of significantly more money into the system than the defendants have been willing to make, or the majority was willing to order in *DeRolph III,* will fail to satisfy our Constitution. The present and foreseeable future budgets do not contain the funds to comply with the original mandates of *DeRolph v. State* (1997), 78 Ohio St.3d 193, 677 N.E.2d 733 ("*DeRolph I*"), and *DeRolph v. State* (2000), 89 Ohio St.3d 1, 728 N.E.2d 993 ("*DeRolph II*"); therefore, only a revision of the entire funding system will suffice. If a systematic overhaul is not an issue in the mediation, a permanent and lasting remedy will not be obtained. Any mediated solution will only be transitory.

{¶ 55} The concurring opinion contends that the issues of overreliance on local property taxes and a complete overhaul of the funding system will also be within the scope of the matters for consideration in mediation. That may very well be the desire of the plaintiffs (and of the concurring justice), but it is questionable whether the defendants will be inclined to mediate issues that they have steadfastly refused to discuss for more than ten years. The defendants have also disregarded the unmistakable rulings of this court on those issues that were entered in *DeRolph I* and *II*. This issue of transforming the basic funding system, of necessity, requires the participation of the Governor and every member of the General Assembly, not simply a select group facilitated by an individual from outside the state of Ohio.

{¶ 56} Moreover, given that the majority in *DeRolph III* mandated a compromise that allowed the state to dispense with any overhaul of the system whatsoever in exchange for an unsatisfactory increase of state expenditures within the contours of the existing faulty system, some members of this court have sent a message that money is the only issue in this case. Therefore, the dispute to be

18

mediated may now be unduly limited to merely trying to compromise over how much additional money the state should be required to spend. The state may only be willing to mediate a reduction in funding from the number the majority in *DeRolph III* has now apparently backed away from. While the plaintiffs should continue to seek the systematic overhaul of the school-funding system, the current parameters of this court's orders seem to preclude that as a realistic possibility. Until an overhaul of the system is accomplished, there is no hope for adequacy of funding, since the state has no additional funds to appropriate to our schools from an already overburdened state budget.

{¶ 57} I fear that, as the Supreme Court of New Hampshire stated in response to a motion to compel mediation in that state's school funding litigation in *Claremont School Dist. v. Governor* (1998), 143 N.H. 154, 159, 725 A.2d 648, 651, "the oral arguments before us in this matter made it clear that mediation is an impractical solution." It appears that many of the same concerns that caused the *Claremont* court to reach that conclusion are also present in this case.

{¶ 58} For all the foregoing reasons, I adhere to my original position, as expressed in my dissent in *DeRolph III*, that we should find that the state has fallen short in its recent efforts to rectify the school-funding dilemma. We should return this matter to the General Assembly for further action by that body, giving them additional time to actually overhaul the entire system. If the entire school-funding system was overhauled, including the elimination of overreliance on local property taxes, there would be no need to make further cuts to other segments of state government. Because the majority does not follow that course of action, I dissent.

―――――――――

**COOK, J., dissenting.**

{¶ 59} I respectfully dissent from the majority's order referring this cause to mediation.

**{¶ 60}** I voted to grant the motion for reconsideration based on my view that the court should have dismissed this case from the outset. Our reconsideration procedures enable those members in the majority to rectify an error and afford those in dissent the means to support such action. Today's decision to refer this cause to court-ordered, court-supervised settlement proceedings continues to inject this court into matters beyond the scope of the judicial function, thereby ignoring the many errors that we could correct.

**{¶ 61}** My objections to this case and to the actions of this court are well documented. See *DeRolph v. State* (2001), 93 Ohio St.3d 309, 380-383, 754 N.E.2d 1184, 1244-1247 (Cook, J., dissenting). I continue to adhere to these objections. The political question doctrine ought to have steered this court away from becoming embroiled in the public policy debate regarding school funding and budgeting priorities. See *id*. at 380-381, 754 N.E.2d at 1244-1245. Instead, various majorities of this court have willfully encroached upon the functions of the legislature, expanded this court's jurisdiction in contravention of the Ohio Constitution, and modified our rules of practice and well-established legal doctrines on an *ad hoc* basis. This court's continuing desire to use judicial power to achieve the public policy goals of a majority of its members lacks legitimacy.

**{¶ 62}** The only action that this court should take—because it is the only action legitimate under law—is to dismiss this case.

_____