DeRolph et al., Appellees, *v.* The State of Ohio et al., Appellants.

[Cite as *DeRolph v. State* (2001), 94 Ohio St.3d 40.]

(No. 99–570—Submitted November 26, 2001—Decided December 13, 2001.)

Moyer, C.J.  On November 16, 2001, this court entered an order referring the instant cause to a settlement conference to be presided over by a master commissioner.  93 Ohio St.3d 628, 758 N.E.2d 1113.  We reviewed the record and identified, for purposes of S.Ct.Prac.R. XIV(6), the parties and counsel we deemed to be appropriate participants in mediation.

In addition, the court identified nine mediators of national reputation as candidates for appointment as master commissioner and invited the parties to submit to the court comments on, or challenges for cause to, any of the candidates.

On November 26, defendants-appellants, the state of Ohio, the Ohio Board of Education, the Ohio Superintendent of Public Instruction, and the Ohio Department of Education (collectively, "the state") filed a memorandum in response to the order.  The Attorney General, as legal counsel for the state, requested clarification of the November 16 order and a status conference at which both procedural and substantive issues relating to the initiation and progress of the ordered mediation could be discussed.

On the same day, plaintiffs-appellees, joined by counsel for members of the minority party of the General Assembly, filed a memorandum providing helpful comment regarding candidates named in the November 16 order, which they described as a " 'blue ribbon panel.' "  They have not, however, filed a response to the state's requests for clarification and for a status conference.

The state's characterization of its request as one for clarification is euphemistic—the state clearly takes issue with the substance of this court's order rather than with any alleged ambiguity.  Having requested, and been granted, reconsideration of our decision on the merits in *DeRolph v. State* (2001), 93 Ohio St.3d 309, 754 N.E.2d 1184 (*"DeRolph III"*), the state now takes issue with the court's designation of the counsel who will participate in the mediation ordered upon reconsideration.

The state's dissatisfaction with our November 16 order is based on three arguments. It first asserts that "only the Attorney General can represent the state" and contends that no counsel other than Assistant Attorneys General or appointed special counsel should be permitted to participate in the mediation on behalf of any entity of the state and specifically on behalf of the Governor and members of the General Assembly. The state thereby challenges this court's initial identification of the counsel to participate in the mediation.

Second, the state contends that "including amici counsel in the mediation inappropriately elevates the amici to party status." The state thereby challenges this court's identification of parties to be included in the mediation.

Third, the state contends that "[t]he General Assembly cannot negotiate against itself" or "be bifurcated and represented on both sides of the negotiating table." The state thereby challenges the court's inclusion in the mediation of members of the minority party.

We reject these contentions.

I

The State Has Waived Any Objection to the Appearance of Counsel for the Governor, the President of the Senate, the Speaker of the House, and Representatives of the Minority Caucus As Identified in the Record

The state draws our attention to three provisions of the Revised Code. R.C. 109.02 provides, "The attorney general is the chief law officer for the state and all its departments * * *. [With certain exceptions], no state officer * * * or head of [an] * * * institution of the state shall employ, or be represented by, other counsel or attorneys at law." R.C. 109.03 authorizes the Attorney General to appoint Assistant Attorneys General. R.C. 109.07 authorizes the Attorney General to appoint special counsel to represent the state in civil actions in which the state is a party or directly interested.

We acknowledge the import of these statutory provisions. What is surprising, however, is that the Attorney General in her November 26 response acknowledges that the counsel who have represented two Governors and four leaders of the houses of the General Assembly over the course of this appeal were not appointed special counsel pursuant to this statutory authority. She had not, however, objected before November 26 to the representation of any elected official as an *amicus curiae* by private counsel or rebutted the inference that the counsel had been appointed special counsel.

When we initially identified counsel for the participants in our order of November 16, this court did no more than examine the record and incorporate the designations of attorney-client relationships as they have appeared since this

appeal was filed in this court in 1995. For six years, neither the Attorney General nor anyone else objected to those designations.

Moreover, the Attorney General has accepted the benefits inherent in the separate appearances of, and filing of separate *amicus curiae* briefs in support of the state's position by, two Governors and the leaders of the majority party. The time has now passed for the Attorney General to object, and we find that the state has waived its right to challenge the separate appearance of the officials identified in our order of November 16 or their representation by separate counsel.

Of course, nothing precludes the Governor, or any of the legislators who have appeared with the designation of *amicus curiae,* from now choosing the Attorney General rather than private counsel to represent them, assuming that such representation does not create a conflict of interest. But the *amicus* briefs filed by the Governor, the Speaker of the House of Representatives, and the President of the Senate vary dramatically from the briefs filed by certain minority party members of the General Assembly: while the minority members support the plaintiffs-appellees' position, the other state officials support the position of defendants-appellants. The Attorney General simply cannot represent both sides at the same time during mediation without placing herself in an unacceptable position of conflict of interest. To avoid such a conflict, she could, as she has in the past, appoint special counsel pursuant to R.C. 109.07.[1]

The Attorney General also argues that the Governor and the members of the General Assembly who have filed *amicus* briefs are appearing as individuals rather than in their official capacities. The briefs refute that contention. In *DeRolph v. State* (1997), 78 Ohio St.3d 193, 677 N.E.2d 733 ("*DeRolph I*"), then Governor Voinovich filed an *amicus* brief in which he represented himself as appearing in his capacity as "the state's chief executive officer responsible for preparing and proposing to the legislature the biennial budget bill." Similarly, Governor Taft filed an *amicus* brief in *DeRolph III,* 93 Ohio St.3d 309, 754 N.E.2d 1184, in which he described his initiatives as Governor, in collaboration with the General Assembly, to reform assessment, academic standards, and accountability and to improve school facilities.

In addition, then President of the Ohio Senate Stanley J. Aronoff and then Speaker of the Ohio House of Representatives Jo Ann Davidson filed a joint *amicus* brief in *DeRolph I,* 78 Ohio St.3d 193, 677 N.E.2d 733. In that brief, President Aronoff and Speaker Davidson emphasized that they "and the Ohio

---

1. On November 7, 1995, the Attorney General filed notice in this court of the appointment of special counsel for a codefendant, the Ohio Board of Education, although the Attorney General now claims that she represents all four named defendants, including the Ohio Board of Education.

General Assembly ha[d] made a strong fiscal commitment to public education and equity in funding during the past 15 years." More recently, in their official capacities as President of the Ohio Senate and Speaker of the Ohio House of Representatives, respectively, Richard H. Finan and Larry Householder have submitted a similar brief in *DeRolph III*.

Finally, members of the minority party of the Ohio Senate and House of Representatives filed an *amicus* brief through counsel Ben Espy in *DeRolph I*, stating that their reason for filing was to make clear that the brief filed by then president Aronoff and then Speaker Davidson "did not state the position of these Amici, the Ohio Senate, or the Ohio House of Representatives." Members of the minority party in the Ohio House of Representatives and Senate had also filed an *amicus* brief in *DeRolph III*. That brief clarified their position that "the State's brief and the briefs of Amicus Curiae for the State *do not* state the position of these Amici as they argue that the General Assembly has complied with the mandates of the Ohio Constitution and this Court." (Emphasis *sic*.)

In short, Governors Voinovich and Taft, Presidents of the Ohio Senate Aronoff and Finan, Speakers of the Ohio House of Representatives Davidson and Householder, and selected members of the Ohio General Assembly have filed *amicus* briefs throughout the litigation of *DeRolph v. State* and have overtly done so in their official capacities rather than as individual citizens of the state of Ohio.

The Attorney General has failed to timely object to numerous elected officials' appearing as *amici* in their official capacities, but now objects to including at the mediation the counsel who have represented the interests of their clients throughout the litigation. In view of our firm belief that ultimate success of the mediation we have ordered is dependent upon full representation of interests at the mediation table, see discussion below at section II, we find no reason to order a change of legal counsel of the members of the minority party identified in our November 16 order. We perceive no reason, however, why Governor Taft and the members of the General Assembly identified in that order should be precluded from asking the Attorney General to represent them or to invoke R.C. 109.07 and appoint special counsel for them, should they so desire. Should such a change in representation occur, the court should be promptly notified of the substitution.

II

A Court–Ordered Settlement Conference Pursuant to S.Ct.Prac.R.
XIV(6) Is a Separate and Independent Alternate Dispute
Resolution Mechanism: It is Not Litigation

Each aspect of our order of November 16 was motivated solely by our desire to create an opportunity for the interested parties to achieve a full, final, and lasting

resolution of this long-lived litigation. Experience has demonstrated that a satisfactory result is fostered in public-policy mediations—as contrasted with private dispute mediations involving individuals—by including representatives expressing the full range of competing interests.

The state acknowledges as "constitutionally true" that "any settlement on behalf of the State of Ohio must involve both the Governor and the General Assembly." It contends, however, that the inclusion of members of the General Assembly who have appeared as *amici* will impede mediation and implies that their inclusion reduces the chance that mediation will succeed.

We disagree. Mediation is not litigation. It is appropriate that the Governor, the President of the Senate, the Speaker of the House, and a representative of the minority party all participate in mediation.

One of the four defendants named in this litigation is "the State of Ohio." Clearly, for purposes of this case, the defendant "state of Ohio" includes the General Assembly. In our November 16 order, we noted that the plaintiffs-appellees in their first amended complaint alleged that " 'Defendant State of Ohio, *through the Ohio General Assembly,* is required to provide for a system of public education in the State of Ohio' " and that in so doing, they "effectively made all members of the General Assembly defendants." (Emphasis added in November 16 order.) *DeRolph v. State* (2001), 93 Ohio St.3d 628, 758 N.E.2d 1113, at fn. 2.

The burden of meeting the constitutional standard announced by a majority of this court in *DeRolph I* and *DeRolph II* does not fall only upon the leaders of the General Assembly or only upon one party's caucuses. The Ohio General Assembly is composed of one hundred thirty-two members and not just the majority caucuses or the majority leadership. It is not for this court to determine or presuppose the precise combination of votes that produce any legislation—and certainly not the legislation that is the subject of this case. All members of the General Assembly are entitled to be represented by legal counsel.

Of course, ensuring representation of the minority party at the mediation table will not alter political realities, nor should one infer that its presence in mediation necessitates its assent to achieve settlement. Clearly, any resolution reached through mediation (or as the result of court order, should mediation fail) must ultimately be implemented by the adoption of legislation by majorities in both chambers of the General Assembly. Accordingly, including representatives of both the majority and the minority parties is a practical and appropriate step to improve the chances that the mediation process will produce a result to which the greatest possible majority of the single entity of the General Assembly will assent.

Nor does inclusion of representatives of the majority and minority parties in the mediation elevate or otherwise alter the status of the members of the General Assembly, as argued by the state, as that status existed before our order of November 16. The presence of representatives of both parties will, however, ensure that a more complete representation of the views of the General Assembly, a party in the cause before us, is brought to the mediation.

A vital component of mediation of public-policy disputes is that those with authority to implement a settlement agreement must be fully represented at the mediation table.[2] For example, in our order of November 16, we cited the settlement agreement in *Minneapolis Branch of the NAACP v. Minnesota* and *Xiong v. Minnesota* (2000), Hennepin Cty. Dist. Ct. Nos. 95–14800 and 98–2816, consolidated, unreported. That settlement was obtained only by the addition to mediation of school districts that were not parties to the suit.[3]

The possibility of a mediated settlement decreases when key stakeholders are not at the table.[4] In Alabama, a court-ordered mediator helped parties reach agreement on a remedial plan to restructure the entire state educational system.[5] Unfortunately, the lack of participation by some groups caused implementation of the agreement to fail. *Id.*

One should not misunderstand the manner in which mediations of the nature that we anticipate here may be conducted. Typically in mediations involving multiple disputing parties, the mediator meets separately with the parties in what are termed "private caucuses." In the private caucuses, the mediator attempts to determine the actual positions of the parties—what they must have in a final agreement and what they are willing to yield. A party in a caucus may limit the information the mediator may share with opposing parties. Only the mediator may know the strategy, the motivation, and the ultimate settlement position of each party. After the mediator has met in private caucuses with the parties a joint meeting may be conducted. In some mediations, the parties never meet in a joint meeting.

---

2. Brett A. Williams, Comment, Consensual Approaches to Resolving Public Disputes (2000), 2000 J. Disp. Resol. 135, 141, citing Lawrence Susskind & Jeffrey Cruikshank, Breaking the Impasse: Consensual Approaches to Resolving Public Disputes (1987) 186–236.

3. See *Anne O'Connor, NAACP Lawsuit Settlement Enlists Suburban Schools: Minneapolis—St. Paul Star Tribune* (Mar. 21, 2000). See Appendix.

4. Brett A. Williams, Comment, Consensual Approaches to Resolving Public Disputes (2000), 2000 J. Disp. Resol. 135, 146, citing Nancy Kubasek & Gary Silverman, Environmental Mediation (1988), 26 Am. Bus. L.J. 533, 550.

5. Michael A. Rebell & Robert L. Hughes, Schools, Communities, and the Courts: A Dialogic Approach to Education Reform (1996), 14 Yale L. & Policy Rev. 99, 161.

The important point is that any party to the mediation has control over the sharing of information that it may consider sensitive and may thereby protect the confidentiality of its position in the mediation.

For this reason, no party in this mediation should be concerned that an attorney representing another party who may ultimately share in the responsibility of approving a settlement will gain some undue advantage by participating in the mediation.

We trust that the parties identified in our November 16 order will devote their resources to the mediation. The task is difficult, but disputing parties and their lawyers all across this country have demonstrated that it is not impossible.

## III

### Status Conference Denied

The Attorney General's request for a status conference is denied at this time. As is clear from the order of November 16, issues of both the procedure and substance of the mediation will be a primary focus of the mediation participants under the guidance of the master commissioner at the initial stage of the mediation.

*Requests denied.*

DOUGLAS, PFEIFER and LUNDBERG STRATTON, JJ., concur.

RESNICK and F.E. SWEENEY, JJ., dissent.

COOK, J., dissents.

---

**ALICE ROBIE RESNICK, J., dissenting.** I dissent from today's opinion of the majority for the same reasons I dissented from the majority's order of November 16, 2001, in this matter. At that time, I stated that the "issue of transforming the basic funding system, of necessity, requires the participation of the Governor and every member of the General Assembly, not simply a select group facilitated by an individual from outside the state of Ohio." 93 Ohio St.3d 628, 641, 758 N.E.2d 1113, 1123 (Resnick, J., dissenting).

Obviously, the state defendants can settle this case only by enacting legislation that will bring our state's system for funding public schools into compliance with the Ohio Constitution. The majority seems to recognize this inescapable fact in its opinion today, stating, "The burden of meeting the constitutional standard announced by a majority of this court in *DeRolph I* and *DeRolph II* does not fall only upon the leaders of the General Assembly or only upon one party's caucuses.

The Ohio General Assembly is composed of one hundred thirty-two members * * *. Clearly, any resolution reached through mediation * * * must ultimately be implemented by the adoption of legislation by majorities in both chambers of the General Assembly."

As I have stated numerous times at every phase of this litigation, it is crystal clear to me that only a complete systematic overhaul of the funding system will make the system "thorough and efficient." See Section 2, Article VI of the Ohio Constitution. I continue to question how, given the scope of the legislation that would have to be enacted to bring about a complete overhaul of the system, a comprehensive solution can emerge from mediation. Perhaps at mediation the defendants can commit to *proposing* specific legislation, or to *attempting* to enact something, but I do not see how the defendants can definitively agree to any specific solution.

As we have seen in the past, the promise of the General Assembly's leadership to deliver votes from caucus members on any particular piece of legislation can be very different from the reality of actually amassing sufficient votes. This difference would seem to be particularly acute when, as here, the necessary legislation must be so extensive. Thus far, the attempts to restructure the funding system have lasted for many years and have involved many different members of the General Assembly as the years have passed. The present members of the General Assembly can in no way obligate future members to vote a certain way on prospective legislation. Mediation is not a viable solution if the funding system is to be truly reformed.

F.E. SWEENEY, J., concurs in the foregoing dissenting opinion.

---

COOK, J., dissenting. I respectfully dissent from today's order regarding the details of the court-ordered, court-supervised settlement proceedings. The fact that this court's rule of practice regarding settlement conferences would, if followed, exclude individuals from the negotiating table whom the majority finds necessary reveals how inherently ill suited judicial proceedings are to this case.

The majority does not explicitly find that the Attorney General is wrong to seek to exclude the *amici* from settlement proceedings based on the status of those individuals. Rather, the majority contends that it is simply too late to object to the involvement of the *amici* to keep them from the negotiating table. But nowhere does the law accord *amici* the status of parties.

The definition of an *"amicus curiae"* is *"[a] person who is not a party to a lawsuit* but who petitions the court or is requested by the court to file a brief in the action because that person has a strong interest in the subject matter." (Emphasis added.) Black's Law Dictionary (7 Ed.1999) 83. See, also, *Lakewood*

*v. State Emp. Relations Bd.* (1990), 66 Ohio App.3d 387, 394, 584 N.E.2d 70, 74 ("*Amici curiae* are not parties to an action."). *Amici* should not participate in a settlement conference, then, because this court's own rules of practice provide for participation in settlement conferences *only by parties.* S.Ct.Prac.R. XIV(6)(A), for example, provides that "[a]t the settlement conference, the *parties* shall explore settling the case, simplifying the issues, and expediting the procedure, and may consider any other matter that might aid in resolving the case." (Emphasis added.) S.Ct.Prac.R. XIV(6)(B) states that "[i]f a case is referred for a settlement conference, each *party* to the case, or the representative of each *party* who has full settlement authority, and the attorney for each *party* shall attend the conference." (Emphasis added.) See, also, S.Ct.Prac.R. XIV(6)(C) ("On motion by a party, the Supreme Court may * * * extend filing deadlines.").

Given that this court's rules of practice provide for the participation only of parties in a settlement conference, the majority's order—despite claiming otherwise—stands for the proposition that "a person who is not a party to a lawsuit" can be transformed into a party by operation of law, if he or she stays around the proceedings long enough. And the Attorney General should have, according to this reasoning, objected earlier in these proceedings to the presence of the *amici* as *parties*, though they were not. To treat the *amici* as if they were parties ignores this court's own rules and law on the subject. See Civ.R. 17 to 25.

This order compounds the prior missteps of this court in this case. See *DeRolph v. State* (2001), 93 Ohio St.3d 309, 380–383, 754 N.E.2d 1184, 1245–1247 (Cook, J., dissenting).

Copyright 2000 Star Tribune.
Republished with permission of Star Tribune, Minneapolis-St. Paul.
No further republication or redistribution is permitted without the written consent of Star Tribune.

**NAACP lawsuit settlement enlists suburban schools**

By Anne O'Connor, Norman Draper; Staff Writers

Low-income students from Minneapolis would have a better chance to attend suburban schools and the city's magnet schools under settlement of a major lawsuit against the state by the Minneapolis branch of the National Association for the Advancement of Colored People.

The NAACP called the settlement, made public Monday, "a historic moment" - the first settlement of an education-adequacy suit in the nation.

"This is a significant settlement," said John Shulman, attorney for the NAACP. "This is a huge change, a radical departure from business as usual."

It calls for action in four areas:

- Eight suburban districts would be required to collectively reserve 500 seats for low-income city students each year for the next four years, for a total of 2,000. The state would pay for busing.

- The Minneapolis School District would be required to reserve up to 50 percent of its slots in magnet programs for low-income students who choose them.

- The state would be required to give each Minneapolis school a "report card" based on 23 factors and to start a process to shut down and restart a school if it failed to meet a certain score.

- More information about school options would have to go to low-income families.

Hennepin County District Judge Gary Larson announced the settlement last week. Details weren't released until Monday because the attorneys were writing the 23-page agreement.

The settlement, which must be approved by the Minneapolis School District and several metropolitan districts, addresses two key stumbling blocks in the past: busing and community schools.

On the first issue, a busing system paid for with state money would be established.

On the second, the agreement attempts to partly address the NAACP's concern that Minneapolis' community schools policy increases segregation.

Shulman has said that if parents had real choices, they would send their children elsewhere. But Minneapolis officials say that more than 90 percent of families who chose a school get their first choice and that more families are choosing community schools.

The settlement "puts the question to rest once and for all," said Christine Jax, the state's education commissioner. "There are some people who say [that] if there were choices

available, people would make use of them. Other people say, `No, people want schools close to home.' "

But Gary Orfield, a professor of education and social policy at Harvard University and an expert in national desegregation issues, said the settlement is "not very substantial."

"This is better than what existed before, but not any real opportunity for more minority kids," Orfield said. He cited several cities - Boston, Milwaukee and St. Louis - that send thousands of students to suburban districts each year.

Ron Edwards, the NAACP's state education chairman, said he's concerned about the small scale of the agreement, the voluntary nature and the fact that there's no specific new money allocated for the program.

"Have we forgotten the other 48,000 children?" he said. "There's been no breakthrough. The numbers are disappointing."

Shulman acknowledged that the settlement isn't what the NAACP was after when it sued the state five years ago, but he believes it will help children.

"It has been a hard, hard, hard fight," he said. "Is it our ideal solution? No. Our ideal solution would be a complete metropolitan desegregation plan with a complete metropolitan school district. We thought it was far more important to obtain real benefits and real opportunities for tens of thousands of children now than to wait another five or six years with nothing guaranteed at the end."

Minneapolis schools Superintendent Carol Johnson agreed. "I don't think any of us wanted to spend the next eight months talking about trial dates and depositions," she said. "We did want to spend the next eight months talking about student achievement."

**Approval needed**

Neither the Minneapolis School District nor the eight suburban districts were direct parties in the suit, but the settlement hinges on their approval. The suburban districts are Richfield, St. Louis Park, Wayzata, Columbia Heights, Edina, Hopkins, Robbinsdale and St. Anthony/ New Brighton.

They are part of the suburban West Metro Education Program (WMEP), a voluntary desegregation effort. WMEP districts must still take the tentative agreement to their school boards for discussion. The WMEP Joint Powers Board, made up of a superintendent and school board member from each member district, will vote on the proposed settlement Thursday. (One district, Brooklyn Center, is not participating because it has a far higher percentage of minority students than its fellow WMEP districts.)

At least two suburban superintendents said they were taking the settlement to their boards Monday night: Richfield's Barbara Devlin and Hopkins' Michael Kremer said they saw no reason why the districts would object.

Jax said the settlement wouldn't require any new money, but would mean a shifting around of funding. She said the money that Minneapolis would lose when a student moves to a suburban district would help pay for transporting that student to the new district. The suburbs would also get the state money attached to each student.

That is, for example, close to $4,000 per student a year in the case of Richfield. Participating districts also would be eligible for desegregation funding that would amount to $93 for every student in those districts. That $93 would have to be used to help improve desegregation opportunities within the districts. (One WMEP district - Wayzata - is not eligible for that funding. Wayzata was not one of the original WMEP districts, and will try to get the funding from the Legislature.)

Kremer and Devlin said they are pleased with the agreement.

"We're moving in the right direction - focusing on kids rather than litigation," Kremer said.

He said Hopkins wouldn't have difficulty providing the spaces required by the settlement. "It's highly likely we will have 85 places available in our district," he said.

But, Kremer cautioned, "for me to tell you that 85 slots will be available for four years would be unrealistic." Currently, 600 students have taken advantage of the state's open-enrollment option to attend Hopkins schools.

Even if districts have the spaces district-wide, there's no guarantee they'll have openings in particular grades or schools.

In the Robbinsdale district, for instance, Armstrong and Cooper high schools are at or near capacity, as are the two middle schools that will be open next year, said district spokesman Bob Noyed. When the schools fill up, they probably will be closed to open enrollment. The district's elementary schools still have room.

In any case, eligible students from Minneapolis - those who live in attendance areas with more than 90 percent students of color - get first shot at whatever slots are open.

Marsha Gronseth, the WMEP's executive director, said it's hard to know whether the settlement will make it tougher for middle-class suburban and Minneapolis students to use open enrollment.

If a district already has low-income Minneapolis students under open enrollment, they will count toward its required slots during the 2001-02 school year.

**In Minneapolis**

The settlement also calls for Minneapolis schools to be overhauled if they fail to earn a certain score on the report card. Using last year's data, seven schools are already targeted for a complete overhaul - Hall, Edison PPL, Four Winds, Broadway, Northeast, Whittier and Morris Park. They would have to be below the score for two years before a takeover would occur.

The settlement also calls for the district to set aside at least 20 percent of incoming kindergarten slots at magnet schools for low-income students. In grades one through five, it would reserve 50 percent of the slots in magnet programs for low-income kids.

Parents would still be required to chose a magnet program, which means meeting the district's deadline in the spring.

"We find that many of our low-income student miss our choice process and show up in September to go to school," Johnson said. "We have to find a way to engage those families."

The settlement calls for more information to be provided to low-income families.

Superintendent Johnson said the agreement builds on the progress the district has been making on its own.

"The truth is, it reaffirms our accountability system," she said of the settlement. "A lot has changed since the lawsuit was filed in 1995."

**The settlement**

The deal between the Minneapolis NAACP and the state includes:

- Access to suburban schools: School districts bordering or near Minneapolis collectively will make at least 500 seats available to low-income students from Minneapolis each year for four years. Students will be bused back and forth.

- "Report cards": The state Department of Children, Families and Learning will issue a "report card" for every Minneapolis public school.

- "Fresh start": Outside audits will be done at schools most in need of improvement. Students in audited schools could choose different schools.

- More information to parents: Children, Families and Learning will make school choice information available in several languages, using avenues such as mailings, a Web site and community groups.

**Making room for Minneapolis students**

Starting in the 2001-02 school year, eight suburban school districts collectively would make at least 500 seats available to low-income students from Minneapolis each year for four years. Students in north Minneapolis could use the program to attend St. Anthony-New Brighton, Columbia Heights, Robbinsdale and Wayzata. Students in south Minneapolis could use the program to attend Richfield, Edina, St. Louis Park and Hopkins. Schools where more than half the students are eligible for subsidized lunch would be excluded. The proposed settlement calls for the program to end in four years.

**Suburbs involved**

Available spaces for students:

Columbia Heights# 26 spaces
Edina 70 spaces
Hopkins 85 spaces
Richfield 42 spaces
Robbinsdale# 127 spaces
St. Anthony/New Brighton 15 spaces
St. Louis Park 43 spaces
Wayzata 92 spaces

# Excludes Highland Elementary (Columbia Heights), Meadow Lake Elementary (Robbinsdale) and Northport Elementary (Robbinsdale).

© Copyright 1998 Star Tribune. All rights reserved.