DEROLPH ET AL., APPELLEES, *v*. THE STATE OF OHIO ET AL., APPELLANTS.

[Cite as *DeRolph v. State*, 97 Ohio St.3d 434, 2002-Ohio-6750.]

*Constitutional law — Education — Schools — Current school-funding system unconstitutional —General Assembly directed to enact a school-funding scheme that is thorough and efficient.*

(No. 1999-0570 — Submitted October 30, 2001 — Decided December 11, 2002.)

Common Pleas Court of Perry County, No. 22043.

ON MOTION FOR RECONSIDERATION.

_____

PFEIFER, J.

{¶1} In *DeRolph v. State* (2001), 93 Ohio St.3d 309, 310, 754 N.E.2d 1184 ("*DeRolph III*"), this court issued an opinion with which none of the majority was "completely comfortable." As the author, Chief Justice Moyer, noted, we did so in an attempt to eliminate the "uncertainty and fractious debate" occasioned by our continued role in the case. Id. at 311, 754 N.E.2d 1184. A motion was filed asking this court to reconsider its decision. We granted that motion and ordered a settlement conference pursuant to S.Ct.Prac.R. XIV(6)(A). *DeRolph v. State* (2001), 93 Ohio St.3d 628, 758 N.E.2d 1113. Settlement efforts were unavailing, and we now rule on the merits of the case on reconsideration.

{¶2} In *DeRolph v. State* (1997), 78 Ohio St.3d 193, 677 N.E.2d 733, syllabus, ("*DeRolph I*"), this court stated, "Ohio's elementary and secondary public school financing system violates Section 2, Article VI of the Ohio Constitution, which mandates a thorough and efficient system of common schools throughout the state." In *DeRolph I*, this court admonished the General Assembly to create a new school-funding system, but otherwise provided no specific

guidance as to how to enact a constitutional school-funding system. Id. at 213, 677 N.E.2d 733. See id. at 262, 677 N.E.2d 733 (Pfeifer, J., concurring) (the majority opinion "does neither more nor less than the syllabus law sets forth").

{¶3} Three years later, after the General Assembly had enacted various changes to the school-funding system, this court again determined that the school-funding system was unconstitutional. *DeRolph v. State* (2000), 89 Ohio St.3d 1, 728 N.E.2d 993 ("*DeRolph II*"). We stated, " '[T]he sovereign people made it mandatory upon the General Assembly to secure not merely a system of common schools,' but rather a thorough and efficient system of common schools. *Miller v. Korns* (1923), 107 Ohio St. 287, 297-298, 140 N.E. 773, 776, approved and followed." *DeRolph II*, paragraph one of the syllabus. As in *DeRolph I*, the majority did not provide specific guidance to the General Assembly as to how to enact a constitutional school-funding system. But, see, *DeRolph II* at 47, 728 N.E.2d 993 (Pfeifer, J., concurring). Some of us praised the efforts of the General Assembly, and that praise was deserved. Id. at 41, 728 N.E.2d 993 (Douglas, J., concurring).

{¶4} We are aware of the difficulties that the General Assembly must overcome, and that is why we have been patient. The consensus arrived at in *DeRolph III* was in many ways the result of impatience. We do not regret that decision, because it reflected a genuine effort by the majority to reach a solution to a troubling constitutional issue. However, upon being asked to reconsider that decision, we have changed our collective mind. Despite the many good aspects of *DeRolph III*, we now vacate it. Accordingly, *DeRolph I* and *II* are the law of the case, and the current school-funding system is unconstitutional.

{¶5} To date, the principal legislative response to *DeRolph I* and *DeRolph II* has been to increase funding, which has benefited many schoolchildren. However, the General Assembly has not focused on the core

2

constitutional directive of *DeRolph I*: "a complete systematic overhaul" of the school-funding system. Id., 78 Ohio St.3d at 212, 677 N.E.2d 733. Today we reiterate that that is what is needed, not further nibbling at the edges. Accordingly, we direct the General Assembly to enact a school-funding scheme that is thorough and efficient, as explained in *DeRolph I*, *DeRolph II*, and the accompanying concurrences.

{¶6} We are not unmindful of the difficulties facing the state, but those difficulties do not trump the Constitution. Section 2, Article VI of the Ohio Constitution states, "The general assembly shall make such provisions, by taxation, or otherwise, as, with the income arising from the school trust fund, will secure a thorough and efficient system of common schools * * *." This language is essentially unchanged from the initial report from the Standing Committee on Education at the Constitutional Convention of 1850-51. I Report of the Debates and Proceedings of the Convention for the Revision of the Constitution, 1850-51 (1851) 693 ("Debates"). Even the minority report, presented by those opposed to the above language, had virtually the same import. It stated, "The General Assembly shall provide by law a system of common schools, and permanent means for the support thereof * * *." Id. at 694.

{¶7} The delegates and through them the people of this state expressed their desire for more and better education and their desire that the state should be responsible for it. Delegate J. McCormick, from Adams County, stated, "Under the old Constitution it is provided that public schools and the cause of education shall be forever encouraged; and, under this constitutional provision, we have trusted the General Assembly for forty-eight years; and we may trust them for forty-eight years longer, without any good result. * * * Our system of common schools, instead of improving in legislative hands, has been degenerating; and I think it is time that we should take the thing in hands ourselves." II Debates 702.

William Hawkins, a delegate from Morgan County, said, "[W]e are warranted by public sentiment in requiring at the hands of the General Assembly a full, complete and efficient system of public education." Id. at 16. The delegates perceived the General Assembly of that time as being insufficiently committed to education. Even though some delegates wanted to leave matters wholly to local authorities, see id. at 17, the delegates in their wisdom decided to include the Thorough and Efficient Clause in the Constitution. They and the people used the Constitution to command ongoing affirmative action by the General Assembly.

{¶8} James Taylor, a delegate from Erie County, stated, "I think it must be clear to every reflecting mind that the true policy of the statesman is to provide the means of education, and consequent moral improvement, to every child in the State, the offspring of the black man equally with that of the white man, the children of the poor equally with the rich." Id. at 11. Samuel Quigley, a delegate from Columbiana County, stated, "[T]he report directs the Legislature to make full and ample provision for securing a thorough and efficient system of common school education, free to all the children in the State. The language of this section is expressive of the liberality worthy a great State, and a great people. There is no stopping place here short of a common school education to all children in the State." Id. at 14. The delegates knew what they wanted, what the people wanted, and that it was necessary to use the Constitution to achieve what they wanted.

{¶9} The Thorough and Efficient Clause is part of our Constitution and part of our heritage. There were delegates who approved of even stronger language. Delegate McCormick proposed "a consolidation of all the general and local funds of the State, and distribution of the amount equally among the children of the State." II Debates at 17. Otway Curry, a delegate from Union County, expressed his concern that the Thorough and Efficient Clause would "prove totally insufficient and powerless." Id. at 710. Were this court to avoid its

responsibility to give continued meaning to the Constitution, his fears would become reality.

{¶10} The Constitution of this state is the bedrock of our society. It expressly directs the General Assembly to secure a thorough and efficient system of common schools, and it does so expressly because the legislature of the mid-nineteenth century would not. As R.P. Ranney, a delegate from Trumbull County, put it, "I desire to lay a plan such as within certain limits the Legislature shall be bound to carry out." Id. at 16.

{¶11} We realize that the General Assembly cannot spend money it does not have. Nevertheless, we reiterate that the constitutional mandate must be met. The Constitution protects us whether the state is flush or destitute. The Free Speech Clause of the United States Constitution, the Equal Protection Clause of the United States Constitution, the Thorough and Efficient Clause of the Ohio Constitution, and all other provisions of the Ohio and United States Constitutions protect and guard us at all times. Harman Stidger, a delegate from Stark County, said, "If we should leave every thing to the Legislature, why not adjourn this Convention sine die, at once?" Id. at 11. The same could be said of this court and the Ohio Constitution.

Judgment accordingly.

RESNICK and F.E. SWEENEY, JJ., concur.

RESNICK, J., concurs separately.

DOUGLAS, J., concurs in judgment only.

LUNDBERG STRATTON, J., concurs in part and dissents in part.

MOYER, C.J., dissents.

COOK, J., dissents.

_____

**ALICE ROBIE RESNICK, J., concurring**.

**{¶12}** I concur in today's majority opinion. Given the views I expressed in my dissent in *DeRolph v. State* (2001), 93 Ohio St.3d 309, 344-375, 754 N.E.2d 1184 ("*DeRolph III*"), I of course agree with this court's decision to vacate the majority opinion in *DeRolph III*. I have no desire to reiterate in detail the contents of that dissent, which were consistent with my views in *DeRolph v. State* (1997), 78 Ohio St.3d 193, 677 N.E.2d 733 ("*DeRolph I*"), and *DeRolph v. State* (2000), 89 Ohio St.3d 1, 728 N.E.2d 993 ("*DeRolph II*"). It appears that much of what this court stated in *DeRolph I* and *II* has fallen on deaf ears. It is not likely that stating at length the same message once again would have much of an effect; rather, it probably would be preaching to the choir, in that only those whose viewpoints align with mine would listen, and the rest of the members of the General Assembly would continue to do nothing.

**{¶13}** That said, I regret that I must nevertheless write. Even though it seems that everything that can be said in this case has already been said, there is a need to send an additional message to the citizens of Ohio and to respond to the Chief Justice's critical dissenting opinion. The Chief Justice appears to be sending his own strong message to the General Assembly that there is no need to do anything further in Ohio to provide each child an adequate education, beyond the trivial face-saving changes he proposes.

**{¶14}** To that end, the Chief Justice ignores the deficiencies in the legislative response thus far and, as did his majority opinion in *DeRolph III*, seems to believe that a half-fought battle is equivalent to a resounding victory as long as this court is no longer involved in this case. As one who has also been immersed in this case for a number of years, and as the author of the majority opinion in *DeRolph II*, I emphatically disagree with the Chief Justice's view of the legislative initiatives enacted in response to the pronouncements of this court.

**{¶15}** The Chief Justice bemoans the fact that further litigation may be inevitable in light of the decision today, calling that possibility an "unfortunate eventuality." Infra at ¶ 35 (Moyer, C.J., dissenting). However, what the Chief Justice's imperceptive view ignores is that as long as the General Assembly does not definitively fix the school-funding problem, which is its task alone, or at least make a realistic effort to do so, further litigation will be inevitable as a matter of course, since the court is the only body that definitively determines the constitutionality of laws.

**{¶16}** In the normal case, when this court finds a particular statute or series of statutes unconstitutional, there is no thought given to retaining jurisdiction, because we assume that our constitutional adjudication will be respected and that if the General Assembly decides to reenact similar legislation, it will take the necessary steps to transform what has been determined to be unconstitutional into something that complies with our Constitution. But as history shows, the General Assembly has never mounted a concerted effort to fix the school-funding crisis and, given the tenor of the Chief Justice's dissent, will not be expected to put forth a good-faith effort to do so in the future. Given that state of affairs, it does seem likely that further litigation will be forthcoming in the area of school funding, even though it apparently will be under a name other than *DeRolph*. However, while the Chief Justice sees this situation as "unfortunate," I view it as inevitable precisely because so long as the system remains unconstitutional, our students' interests can be furthered only by continuing to press for the reformation of the system.

**{¶17}** As I and other members of this court have repeatedly stated, until a complete systematic overhaul of the system is accomplished, it will continue to be far from thorough and efficient and will continue to shortchange our students. The overreliance on local property taxes is the fatal flaw that until rectified will

stand in the way of constitutional compliance. One thing the now-vacated majority opinion in *DeRolph III,* along with the various accompanying opinions, served to illustrate is that the system we have reviewed simply falls far short of satisfying the requirements of our Constitution. Today's result drives home that point, albeit belatedly.

{¶18} The Chief Justice disingenuously tries to blunt the force of this court's decisions in *DeRolph I* and *DeRolph II* by focusing only on the syllabus paragraphs of those two decisions and ignoring the full content and import of what this court actually said. He labels everything beyond the syllabus paragraphs in those two decisions "dicta," and thereby downplays the clear requirement voiced by the majority opinions in those two cases that our school-funding system will never be truly thorough and efficient until a complete systematic overhaul of the system is accomplished. As the majority states, " 'a complete systematic overhaul' of the school-funding system" surely was the "core constitutional directive of *DeRolph I*" and also was a very large part of *DeRolph II*. Supra at ¶ 5.

{¶19} Of course, the Chief Justice was not in the majority in those two decisions, and his effort to recast this court's holdings into something more to his liking rings hollow. The Chief Justice's majority opinion in *DeRolph III* featured this same transparent ploy to justify his implausible view that a system that he had approved in his dissents in both *DeRolph I* and *DeRolph II* had somehow become unconstitutional in his eyes in *DeRolph III* (even though more improvements to the system had been made since *DeRolph II*), unless the further changes ordered by the *DeRolph III* majority were accomplished.

{¶20} In trying to recast the opinions in *DeRolph I* and *DeRolph II* into something that he can agree with, the Chief Justice attempts to pass off his own distorted vision of this case as if it were perfectly logical and well reasoned. In

my view, today's decision, by vacating the majority opinion in *DeRolph III*, gives a fitting burial to an initiative of this court that was ill advised from the start.

{¶21} It becomes obvious that the only practical solution to the dilemma posed by this case lies with the citizens of Ohio. The voters of Ohio have the power to pass a constitutional amendment to the Thorough and Efficient Clause, Section 2, Article VI of the Ohio Constitution, which for all time will require an adequate amount of funding to be spent on every Ohio student regardless of where in the state that child resides. A constitutional amendment is necessary to remedy the General Assembly's failure to perform its responsibilities.

{¶22} One possibility for amending the Thorough and Efficient Clause would be to adopt a requirement of a specific dollar amount of spending for each pupil and a formula for arriving at that number that would ensure that each district has sufficient funds to operate effectively year after year. In that scenario, it would be necessary to include a provision for adjusting the specific dollar amount, to keep pace with inflation and with any other changes in costs that may occur. In this way, if the per-pupil spending is established at an adequate level, overreliance on local property taxes will be eliminated. The state will thereby be required to fund the system at a level that complies with the specific constitutional mandate.

{¶23} I do not lightly advocate amendments to our state's Constitution, which already seems to be more detailed in many areas than it should be. However, in the school-funding area, the stakes are sufficiently high that I do not hesitate to make an exception in view of the General Assembly's reluctance to act. Our education system is the backbone of our democracy and the future of our state. We must give each student a realistic opportunity to succeed, and our current funding system does not do so. This continuing untenable situation has been allowed to endure for far too long, and far too many students have been shortchanged.

{¶24} A majority of this court now corrects a situation that was created simply by a desire for an expedient resolution of this case. Because the current school-funding legislation falls well short of satisfying the requirements of our Constitution, I concur in today's decision and strongly encourage the citizens of Ohio to pursue a constitutional amendment that the General Assembly will not be able to ignore.

_____

**DOUGLAS, J., concurring in judgment only.**

{¶25} The Chief Justice, in his dissent herein, in Section D, entitled "Summary," well states my position on the matter pending before us. I would, as he suggests, reaffirm our decision in *DeRolph III* with the exception of the wealth-screening issue. There are not, however, four votes for that approach. Accordingly, I concur only in the judgment of the majority.

_____

**Lundberg Stratton, J., concurring in part and dissenting in part.**

{¶26} In *DeRolph* v. *State* (2001), 93 Ohio St.3d 309, 754 N.E.2d 1184 ("*DeRolph* III"), I concurred in the decision, not because I believed the school-funding system to be unconstitutional, but rather as a pragmatic compromise to end our role in defining what was "thorough and efficient," under the Ohio Constitution, because it was not our role in the first place to determine this issue. I continue to adhere to the dissents I joined in *DeRolph v.* State (1997), 78 Ohio St.3d 193, 677 N.E.2d 733, and *DeRolph v.* State (2000), 89 Ohio St.3d 1, 728 N.E.2d 993 ("*DeRolph II*").

{¶27} I joined the majority that granted the motion to reconsider *DeRolph* III not because I "changed my collective mind" as the majority asserts, but because both sides conceded that we had been provided faulty data which made the formulas before us inaccurate. Since we are not permitted to go outside the

record, we could not have verified the evidence on our own accord. Having based our decision on testimony that was conceded by both parties to be wrong, it was legally necessary for us to reconsider it.

{¶28} The former majority has regrouped, and now merely declares the funding system not yet constitutional and dismisses the case. While I do not agree with its conclusion, I do believe that it is proper for the majority to dismiss the case once it has reached a finding of unconstitutionality. In that aspect, I differ with Chief Justice Moyer. In no case other than *DeRolph* have we retained jurisdiction once we have made a finding of unconstitutionality. We are not charged by the Constitution with fashioning new legislation that we believe meets the constitutional mandate. That role is assigned only to the legislature, and to the legislature has that role now been properly returned.

{¶29} Therefore, I dissent from the holding that the progress made under *DeRolph II* still falls short of a "thorough and efficient system," but given the majority's decision that the funding system is still unconstitutional, I agree that the majority is correct in not retaining jurisdiction.

_____

**MOYER, C.J., dissenting.**

I

Majority Decision on Reconsideration

{¶30} On September 6, 2001, this court rendered its third decision on the merits in this case concerning the constitutionality of Ohio's system of funding public primary and secondary education. *DeRolph v. State* (2001), 93 Ohio St.3d 309, 754 N.E.2d 1184 ("*DeRolph III*"). On September 17, 2001, the defendants-appellants, the state of Ohio, the Ohio Board of Education, the Ohio Superintendent of Public Instruction, and the Ohio Department of Education

(collectively referred to as "the state"), filed a motion asking this court to reconsider that decision.

{¶31} S.Ct.Prac.R. XI(2)(A)(4) allows a motion for reconsideration of a decision on the merits of a case. "We have invoked the reconsideration procedures set forth in S.Ct.Prac.R. XI to correct decisions which, upon reflection, are deemed to have been made in error." *State ex rel. Huebner v. W. Jefferson Village Council* (1996), 75 Ohio St.3d 381, 383, 662 N.E.2d 339. See, also, *Buckeye Community Hope Found. v. Cuyahoga Falls* (1998), 82 Ohio St.3d 539, 697 N.E.2d 181.

{¶32} In November 2001, we granted the state's motion for reconsideration, thereby delaying issuance of a mandate. *DeRolph v. State* (2001), 93 Ohio St.3d 1470, 757 N.E.2d 381. See, also, S.Ct.Prac.R. XI(4). Rather than immediately reconsidering our holdings in *DeRolph III,* we first ordered a settlement conference pursuant to S.Ct.Prac.R. XIV(6)(A). 93 Ohio St.3d 628, 758 N.E.2d 1113. On March 21, 2002, the court-appointed master commissioner, Howard Bellman, notified the court that mediation had not produced a resolution.

{¶33} Courts exist as forums for the resolution of disputes. Ideally, parties involved in litigation are able themselves to negotiate a settlement of their disputes, through mediation or otherwise. When that does not occur, it is the responsibility of the court to render a final judgment that fully and finally disposes of the issues presented to it. Generally, one or more litigants then feel vindicated while others are left to accept a judgment with which they disagree. Nevertheless, the court has done its work where the parties are able to accept the decision of the court as final, put their dispute behind them, and proceed in accordance with the judgment.

{¶34} Unfortunately, the majority today issues an opinion that ignores as many questions as it decides. It thereby evades its fundamental responsibility to

resolve a dispute it agreed five years ago to resolve and leaves the citizens of Ohio with a decision that can at best be described as ambiguous.

**{¶35}** As a result, it is virtually inconceivable that today's judgment will, in fact, end litigation relative to the constitutionality of Ohio's current school-funding system. The issues will almost certainly again come before this, or another, Ohio court. I write today in anticipation of that unfortunate eventuality. Specifically, I write to reiterate that I do not consider dicta contained in *DeRolph v. State* (1997), 78 Ohio St.3d 193, 677 N.E.2d 733 ("*DeRolph I*"), or *DeRolph v. State* (2000), 89 Ohio St.3d 1, 728 N.E.2d 993 ("*DeRolph II*"), to constitute the law of this case or controlling precedent.

**{¶36}** Unlike the majority, I do not believe the creation of a "complete systematic overhaul" to be the "core constitutional directive of *DeRolph I*," majority opinion at ¶ 5, nor do I believe that the General Assembly is constitutionally required to make such an overhaul. See *DeRolph III,* 93 Ohio St.3d at 312, 754 N.E.2d 1184 ("It is the law *contained in the syllabi* to *DeRolph I* and *DeRolph II* and the principles established by court entry in the case at bar by which we are required to evaluate the constitutionality of the school-funding system now statutorily in place" [emphasis added]). Indeed, today's majority opinion at ¶ 2 acknowledges that *DeRolph I* did " 'neither more nor less than the syllabus law sets forth,' " quoting *DeRolph I*, 78 Ohio St.3d at 262, 677 N.E.2d 733 (Pfeifer, J., concurring).

**{¶37}** The majority today vacates our decision in *DeRolph III*, replaces it with little more than a summary proclamation of a change of "collective mind," declares the current school-funding system unconstitutional, and proclaims *DeRolph I* and *II* to be the law of the case. It thereby returns the parties (and all Ohio citizens) to the uncertain positions in which they stood two and one-half years ago on May 11, 2000, when *DeRolph II* was decided, with one exception:

the majority fails to retain jurisdiction of the cause by the courts as it did after both *DeRolph I* and *DeRolph II*. In so doing, it implicitly declares this case concluded, yet does so without fully disposing of the issues that have developed during the litigation.

{¶38} The court in *DeRolph I* stayed the effect of its decision for 12 months and remanded the cause to the trial court, which was granted plenary jurisdiction to enforce that decision. *Id.*, 78 Ohio St.3d at 213, 677 N.E.2d 733. Shortly thereafter, this court answered in the negative the trial court's question whether the Supreme Court should "retain exclusive jurisdiction of the case to review all remedial legislation enacted." *DeRolph v. State* (1997), 78 Ohio St.3d 419, 678 N.E.2d 886.

{¶39} Writing separately, I cited the general principle that "[t]ypically, when a Supreme Court declares a legislative act to be unconstitutional it does not order the legislative body to enact new legislation." Nevertheless, given the majority's unfortunate decision on the merits in *DeRolph I*, I concluded that "the most expeditious means of removing the uncertainty regarding the constitutionality of the new plan is for this court to issue an order retaining jurisdiction in this court." Id., 78 Ohio St.3d at 422, 678 N.E.2d 886 (Moyer, C.J., dissenting). This conclusion was based on my recognition that "uncertainty will envelop all aspects of public school funding in our state until the day this court deems a new funding system to be constitutional." Id. at 423, 678 N.E.2d 886 (Moyer, C.J., dissenting).

{¶40} When the deadline for compliance in *DeRolph I* had passed, the majority in *DeRolph II* again continued the case, for yet another year, until June 15, 2001. 89 Ohio St.3d at 38, 728 N.E.2d 993. This time, however, the court retained jurisdiction, in anticipation of further briefing in this court at that time.

{¶41} Today, however, the majority says nothing concerning enforcement of its reaffirmed declaration that the current school-funding system is unconstitutional. It neither retains jurisdiction in this court nor remands the cause to the trial court. More than five years after *DeRolph I*, the majority today switches course by implicitly holding that a declaration of unconstitutionality, standing alone, adequately resolves the dispute before us.

{¶42} I believe that the majority, having twice ordered deadlines for compliance with its judgments, raised the expectation that it would ultimately render a decision that would be final. Had the majority chosen the more traditional course in 1997, it would now be acting consistently in simply declaring the system unconstitutional. But too much energy and too many resources have been expended, and the state has made too much progress, for the court now to excuse itself from the process. That is the reason I believe we should modify our decision in *DeRolph III*, resolve the issues, and terminate the role assumed by this court in creating public policy.

{¶43} The majority today directs the General Assembly to "enact a school-funding scheme that is thorough and efficient, as explained in *DeRolph I, DeRolph II*, and the accompanying concurrences." Supra at ¶ 5. I do not believe that the opinions in DeRolph *I* and *II* provide the General Assembly with clear guidance. I certainly do not believe that the opinions of individual members of the court as reflected in separate concurrences are binding in any litigation that may follow today's decision.

{¶44} The majority has yet to define what it means by "overreliance" on property tax, and Ohio's policymakers are left to wonder, "If the percentage of local to state funding were inverted would that be sufficient, or is the majority seeking only a fifty-one-percent reliance on state funds?" Id., 89 Ohio St.3d at 52, 728 N.E. 2d 993 (Moyer, C.J., dissenting). As guidance, the majority offers the observation

that the General Assembly has done no more than merely "nibbl[e] at the edges" of the current system. Supra at ¶ 5. The infusion of billions of additional dollars into the public school system of this state in the last ten years, as demonstrated in the record before us, constitutes significantly more than "nibbling" at the edges or elsewhere.

{¶45} *DeRolph I* and *II* do not require the elimination of all qualitative differences among the state's local schools. This court has recognized in *DeRolph I* and *II,* and in other decisions in this cause, that communities that so choose may supplement their educational programs beyond minimum requirements. *DeRolph I*, 78 Ohio St.3d at 211, 677 N.E.2d 733; *DeRolph II*, 89 Ohio St.3d at 27-28, 728 N.E.2d 993. *DeRolph I* and *II* held that the funding system violates the Thorough and Efficient Clause of the Ohio Constitution; they did not hold that it violates the Equal Protection Clause. *DeRolph* I, 78 Ohio St.3d at 202, 677 N.E.2d 733, at fn. 5; DeRolph *v. State* (1998), 83 Ohio St.3d 1212, 699 N.E.2d 518.

{¶46} Nor do *DeRolph I* and *II* require the elimination of a statewide system of school funding based on property tax. Despite the majority's reliance on statements of individual members of the 1851 Constitutional Convention, historically, "[l]ocal property taxes have funded Ohio schools since 1825—*before* the adoption of the Education Clause." (Emphasis sic.) *DeRolph I*, 78 Ohio St.3d at 265, 677 N.E.2d 733 (Moyer, C.J., dissenting). They have constituted a major source of school funding ever since. To the extent that the majority's original finding of unconstitutionality in *DeRolph I* was based on indefensible deficiencies then existing in some public school facilities, arguably supporting the contention that the local-property-based system then in place violated the Thorough and Efficient Clause, those conditions have been, or are being, ameliorated by the massive infusion of state funds into the public school system since this action was originally filed. *DeRolph I* was centered on the establishment of a floor of

adequacy—a basic educational opportunity, as contemplated in *Miller v. Korns* (1923), 107 Ohio St. 287, 140 N.E. 773, and *Cincinnati School Dist. Bd. of Edn. v. Walter* (1979), 58 Ohio St.2d 368, 12 O.O.3d 327, 390 N.E.2d 813.

**{¶47}** Despite today's decision, I fear that the weight of *DeRolph v. State* will continue to burden not only each of the three branches of state government, but also the school districts and school children the majority decision purports to be helping, as well as other recipients of state tax dollars, e.g., Ohio's public institutions of higher education.

II

Proposed Modification of *DeRolph III*

**{¶48}** As a justice of this court, it is my responsibility to respect and follow its decisions, even those with which I disagree. Our legal system relies on doctrines such as stare decisis and the law of the case to provide consistency in the application of the law. See *Nolan v. Nolan* (1984), 11 Ohio St.3d 1, 3, 11 OBR 1, 462 N.E.2d 410 ("the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels"). Without consistency, the law risks the appearance of caprice.

**{¶49}** It is not unusual for me to join a judgment that is based on a decision with which I initially strongly disagreed. E.g. *Ford v. Talley Mach. Co.* (1994), 68 Ohio St.3d 473, 474, 628 N.E.2d 1351 (Moyer, C.J., concurring). As early as one month after *DeRolph I*, I noted the precedential import of that decision. Writing separately in the court's disposition of the state's motion for reconsideration and clarification, I recognized that a majority of this court had ordered the legislative branch of our state government to adopt new school-funding legislation within a year, observing that "[e]ven those who disagree with the judgment of the court recognize that it is their constitutional duty to respond

constructively to it." *DeRolph v. State* (1997), 78 Ohio St.3d 419, 423, 678 N.E.2d 886 (Moyer, C.J., concurring in part and dissenting in part). Accord *State ex rel. Taft v. Franklin Cty. Court of Common Pleas* (1998), 81 Ohio St.3d 1244, 1247, 691 N.E.2d 677 (Moyer, C.J., concurring) ("I concur in the entry in this case because it is consistent with the views expressed in my separate opinion in [*DeRolph v. State* (1997), 78 Ohio St.3d 419, 678 N.E.2d 886], is consistent with the spirit underlying the majority opinions in [earlier *DeRolph* decisions]*,* and is consistent with the best interests of the people of the state of Ohio"); *DeRolph v. State* (2001), 91 Ohio St.3d 1274, 1276, 747 N.E.2d 823 ("The merit issue is now the law of the case as established by the majority").

{¶50} In *DeRolph III,* we concluded that "[i]t is the law contained in the syllabi to *DeRolph I* and *DeRolph II* and the principles established by court entry in the case at bar by which we are required to evaluate the constitutionality of the school-funding system now statutorily in place." 93 Ohio St.3d at 312, 754 N.E.2d 1184. Our conclusion was consistent with my past judicial practice of acknowledging the law established in prior decisions and was reached in the hope that *DeRolph III* would extricate the court from the circumstances created by a majority of the court. I believed that approach to be consistent with my duty to this court and to the citizens this court serves.

{¶51} In *DeRolph III*, a majority of this court found that the General Assembly had, in the ten years since this case began, crafted significant legislation to address and correct egregious conditions in the poorest of Ohio schools. It recognized that these conditions, upon which this court's original finding of unconstitutionality in *DeRolph I* was based, had been largely ameliorated by programs to remedy severe building deterioration and perceived funding inequities. Id., 93 Ohio St.3d at 323, 754 N.E.2d 1184. We concluded that certain relatively minor modifications to the funding plan adopted by the General

Assembly still needed to be made, but acknowledged that these changes would "not require structural changes to the school foundation program set forth in R.C. Chapter 3317." Id. at 325, 754 N.E.2d 1184.

{¶52} The state urges us to reconsider our holdings (1) that wealth screens may not be used in the state's school-funding foundation formula and (2) that the changes to the foundation formula ordered in *DeRolph III* should be retroactively applied as of July 1, 2001. I would modify *DeRolph III* as discussed below.

### A

### Inaccuracies in the Record

{¶53} In explaining our grant of a motion for reconsideration of *DeRolph III*, we noted, "Both sides acknowledge * * * that the evidence and one of the briefs filed in *DeRolph III* contained inaccurate analysis regarding the cost of funding the base cost formula with wealth screens eliminated." *DeRolph v. State* (2001), 93 Ohio St.3d 628, 631, 758 N.E.2d 1113. The court should now acknowledge the deficiencies in the record before us at the time *DeRolph III* was decided and respond in a constructive manner to preserve the goal of *DeRolph III*, that being extrication of the judiciary from the policy-making role it wrongfully assumed in its earlier *DeRolph* decisions.

### B

### Wealth Screens

{¶54} We noted in *DeRolph III* that the General Assembly, in 2001 Am.Sub.H.B. No. 94 ("H.B. 94"), determined the base cost of an adequate education to be $4,814 per student in fiscal year 2002. 93 Ohio St.3d at 313, 754 N.E.2d 1184. In arriving at that figure, the General Assembly began by using "the unweighted average cost per student of educating students enrolled in selected districts," excluding the richest and poorest: "Under the new law, this selection

began with one hundred seventy school districts that, in fiscal year 1999, met at least twenty of twenty-seven performance standards established by H.B. 94. R.C. 3317.012(B)(1)(a) through (aa). Districts in the top and bottom five percent of income and property wealth bases are deleted to adjust for anomalies within those districts, leaving one hundred twenty-seven model districts." Id.

{¶55} The parties use the term "wealth screens" to refer to the process of eliminating the top and bottom 5 percent of schools from the group of schools whose costs are averaged to determine base per-pupil cost. We held in *DeRolph III* that the per-pupil base cost formula "must be modified to include the top five percent districts and the lower five percent districts," thereby ordering the elimination of wealth screens from the process by which per-pupil base cost is determined. Id. at 324, 754 N.E.2d 1184.

{¶56} Elimination of wealth screens would result in the inclusion of several school districts whose per-pupil spending is unusually high. In their brief filed in *DeRolph III*, the plaintiffs-appellees imputed ulterior motives to the General Assembly in incorporating wealth screens into the foundation formula, describing their use as an arbitrary manipulation to artificially lower the per-pupil base cost. See 93 Ohio St.3d at 332-333, 754 N.E.2d 1184 (Douglas, J., concurring). In contrast, the state contends that the use of wealth screens is wholly justifiable, in that "inclusion of data from the top and bottom five percent of districts has a dramatic effect and distorts the base cost calculation." In other words, the state argues that inclusion of the top and bottom 5 percent of school districts skews the average.

{¶57} In support of its motion for reconsideration, the state has provided us with convincing evidence[1] in support of its contention that "the use of wealth

---

1. The procedural posture of this case is unique; since *DeRolph II* there has not been a traditional record of facts produced in a trial court. It is appropriate that we accept supplementary

screens is standard practice throughout school finance and the discipline of statistics generally." It has provided us ample justification, more persuasively presented than in the briefs on the merits, for rejecting the proposition that the General Assembly's adoption of wealth screens was merely an attempt to artificially lower the final per-pupil base cost, that it evidences unlawful "residual budgeting," or that it was otherwise purely arbitrary. The record contains expert testimony from both sides supporting the use of wealth screens as an appropriate means of determining per-pupil base cost, as follows:

{¶58} • William Driscoll, an expert for the plaintiffs-appellees, testified in a deposition that he agreed with a report that stated, "Standard statistical analyses typically use 5% to estimate the tails at either end of a distribution. In this case, the tails or extreme observations do fall, in fact, in approximately the lowest and highest 5% of the range."

{¶59} • David Monk, an expert for the state and Dean of the College of Education at the Pennsylvania State University, testified in an affidavit that a "5% exclusion of this kind is a well established practice within the field of school finance given the common existence of highly atypical school districts in the tails of wealth and income distributions." Dean Monk stated that the General Assembly's "decision to use a version of the observed best practices method as the basis for its estimation of the cost of an adequate education presumes the availability of a standard that is relevant to the affected districts. * * * The purpose of the 5 percent exclusion rule is to remove highly atypical districts and to thereby preserve the spirit as well as the integrity of the standard."

---

evidence such as the affidavits of experts submitted by both parties. See *DeRolph v. State* (2001), 91 Ohio St.3d 1274, 1275, 747 N.E.2d 823 ("*DeRolph* is not a traditional appeal, in which the court has a previously established record available for review. Rather, *DeRolph* has become a hybrid which will require this court to engage both in factfinding and application of law to those facts * * * ").

**{¶60}** • Dr. John Augenblick, an expert consulted by the General Assembly during its legislative deliberations, testified at trial in 1998 that the spending by Ohio school districts within the top and bottom 5 percent based on wealth was atypical and should not be included in the averaging process. Dr. Augenblick testified that wealthy districts falling in the upper 5 percent of spending "provide things that go well beyond what you might think are kind of the basic or adequate services."

**{¶61}** • Wendy Zahn, a senior budget analyst for the Legislative Service Commission, stated that it is important to reduce the effects of the extremes of a distribution when data distribution is not normal and that "a widely used method for eliminating outliers" is to use the 5th percentile to the 95th percentile.

**{¶62}** • Dr. William I. Notz, professor of statistics at the Ohio State University, stated:

**{¶63}** "If the mean of a set of data with the most extreme values removed differs markedly from the mean computed using all the data, the extreme values would be considered outliers. In such a case, standard practice is to consider the trimmed mean as more representative [of] the center of the data.

**{¶64}** "Data such as income and property values typically contain outliers and it is not surprising that the school district expenditure data shows evidence of outliers. If data from all school districts meeting the 20-27 standards are used, the base cost (average expenditures per pupil) is $5,032. Inflated to FY02 values, this number becomes $5,467. If the same quantity is computed after deleting the wealthiest 5% and poorest 5% of the districts, and is inflated to FY02 values, this number (a trimmed mean) becomes $5,023. This would be considered a marked difference *and the trimmed mean ($5,023) would be considered more representative of a typical value.*" (Emphasis added.)

{¶65} The plaintiffs-appellees remain adamantly opposed to the use of an "inferential methodology" based on model school districts to derive a foundation formula for funding public education. Wealth screens are one aspect of such a funding approach. However, the General Assembly—not the plaintiffs-appellees or this court—remains the entity constitutionally charged with the responsibility of establishing a thorough and efficient system of common schools. As recognized by the majority in *DeRolph II*, 89 Ohio St.3d at 18, 728 N.E.2d 993, "deciding what methodology to adopt is a policy determination."

{¶66} There is nothing inherently unconstitutional in the method chosen by the General Assembly. Moreover, both the state and the plaintiffs-appellees have acknowledged that "the evidence and one of the briefs filed in *DeRolph III* contained inaccurate analysis regarding the cost of funding the base cost formula with wealth screens eliminated." 93 Ohio St.3d at 631, 758 N.E.2d 1113.

{¶67} Upon reconsideration, and specifically in view of the fact that we had been provided inaccurate data at the time *DeRolph III* was decided, I believe our decision should be modified pursuant to S.Ct.Prac.R. XI. I am persuaded that the General Assembly's incorporation of wealth screens in determining the school foundation formula is acceptable. Accordingly, I would modify our opinion in *DeRolph III* to allow the exclusion of the top and bottom 5 percent of school districts in the calculation of per-pupil base costs as required by H.B. 94.

C

Effective Date of Formula Changes

{¶68} Our order in *DeRolph III* required that changes to the foundation formula be applied retroactively to July 1, 2001. 93 Ohio St.3d at 324, 754 N.E.2d 1184. The state argues that this aspect of our decision "contrasts sharply with the Court's prior decisions in this case and the practical considerations they recognize, as well as other precedent under the Ohio Constitution."

**{¶69}** We are now well into the second year of the financial biennium that began on July 1, 2001. The state contends that any changes to the foundation formula ordered by this court will require time to implement and that economic circumstances have changed in the state since *DeRolph III* was announced. I agree that the effective date prescribed by *DeRolph III* is no longer realistic. Moreover, the further July 1, 2001, recedes into the past, the more likely it is that retroactive application of *DeRolph III* to that date would result in a one-time infusion of additional funds unconnected to the current budgets of school districts.

**{¶70}** Upon reconsideration, I believe that the changes to the school foundation formula ordered in *DeRolph III*, modified as stated herein, should be implemented effective July 1, 2003, and applied to the subsequent years designated in R.C. 3317.012(A)(1).

D

Summary

**{¶71}** I would hold that wealth screening of school districts as mandated by H.B. 94 may be used in determining per-pupil base cost for purposes of the school foundation formula. I would also reaffirm our decision in *DeRolph III* that the state, having elected to retain a foundation program based on the average spending of selected districts, must determine that base cost by using only those school districts meeting the performance standards set by R.C. 3317.012(B)(1)(a) through (aa) without rounding to include additional lower-spending districts and without adjusting for the echo effect, effective July 1, 2003. Cf. *DeRolph III*, 93 Ohio St.3d at 324-325, 754 N.E.2d 1184.

**{¶72}** Our decision in *DeRolph III* should otherwise be reaffirmed, including our holding that the parity aid program established by the General Assembly must be fully funded not later than July 1, 2003. Id. at 325, 754 N.E.2d 1184.

_____

**COOK, J., dissenting.**

{¶73} For the reasons I have expressed throughout this court's consideration of this cause, the court should dismiss this case. See *DeRolph v. State* (2001), 93 Ohio St.3d 309, 380-383, 754 N.E.2d 1184 (Cook, J., dissenting).

_____

Bricker & Eckler, L.L.P., Nicholas A. Pittner, John F. Birath Jr., Sue W. Yount, Quintin F. Lindsmith and Susan B. Greenberger, for appellees.

Betty D. Montgomery, Attorney General, Mary Lynn Readey, Roger F. Carroll and James G. Tassie, Assistant Attorneys General, for appellants.

_____