*948 Read, J.
(dissenting). This case is not about whether education is important for the vitality of our democracy — of course, it is. This case is not about whether the children who attend New York City’s public schools require more than an eighth-grade education to meet the demands of today’s world — of course, they do. This case is not about whether New York City’s public schools have too often failed to furnish our children the learning opportunities that they deserve — of course, they have. These are obvious truths, universally acknowledged, which have lately spurred the most significant education reform effort in the history of the New York City public school system. Rather, this case is about whether the perceived shortcomings of New York City’s public schools are constitutional infirmities under the Education Article attributable to inadequate state funding. On a more fundamental level, this case is about whether the courts or the Legislature and the Executive should set education policy for our public schools. Because the constitutional standard crafted by the majority to define a “sound basic education” is illusory, because the causal connection between the level of state aid and any deficiencies in New York City’s public schools is not proven, and because the majority’s proposed remedy exceeds the prudential bounds of the judicial function, I respectfully dissent.
Sound Basic Education
The New York Constitution does not mandate an educational system of a certain quality in express terms. The relevant constitutional text simply reads: “The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated” (NY Const, art XI, § l).[1] The words “sound basic education,” which have become the catchphrase for an inferred constitu *949 tional guarantee of an education of a certain quality, first appeared in our decision in Board of Educ., Levittown Union Free School Dist. v Nyquist (57 NY2d 27, 48 [1982] [Levittown]).
The plaintiffs and intervenors in Levittown sought a declaration that the State’s school financing system, then as now comprised of local taxation and state aid, violated the Equal Protection Clauses of the State and US Constitutions and the State Constitution’s Education Article because of the funding disparities between wealthier and poorer school districts. We rejected the equal protection claims on the ground that the State had demonstrated a rational basis for its school financing system: “the preservation and promotion of local control of education” (id. at 44).
We further observed that the Education Article focuses on a “State-wide system assuring minimal acceptable facilities and services,” not a system assuring equal educational facilities and services throughout the State (id. at 47). We recognized that the State undeniably had in place a system of free schools and a statutory framework requiring minimum days of school attendance, specific courses, textbooks and qualifications for teaching and nonteaching staff. Accordingly,
“[i]f what is made available by this system (which is what is to be maintained and supported) may properly be said to constitute an education, the constitutional mandate is satisfied.
“Interpreting the term education, as we do, to connote a sound basic education, we have no difficulty in determining that the constitutional requirement is being met in this State, in which it is said without contradiction that the average per pupil expenditure exceeds that in all other States but two” (id. at 48 [emphasis added]).
We were careful to register our reluctance to interfere with the Legislature’s funding allocations among competing imperatives by mandating an even higher priority for education funding “in the absence, possibly, of gross and glaring inadequacy” (id.).
The suggestion in Levittown of a possibly justiciable claim became a reality in Campaign for Fiscal Equity v State of New York (86 NY2d 307 [1995] [CFE I]). Because the case came to us in the procedural posture of a motion to dismiss, all the complaint’s averments were deemed true (see CFE I, 86 NY2d at 318). We did not, however, measure the allegations of gross and glaring inadequacy against the constitutional standard to *950 determine if the complaint stated a cause of action under the Education Article. In fact, we refused to “attempt to definitively specify what the constitutional concept and mandate of a sound basic education entails” (id. at 317). Instead, we crafted a “template” (“the basic literacy, calculating and verbal skills necessary to enable [children] to function as civic participants capable of voting and serving as jurors”) for the trial court to utilize to establish the meaning of a “sound basic education” after discovery and trial (id. at 317-318).
Thus was a constitutional standard transformed into the end product of a trial at which experts aired differing views[2] 3of what is required for minimal educational proficiency and employment success in a competitive urban society. The trial court would be left with policy choices to make, not factual contentions to resolve. The trial court would have to fashion “the constitutional concept and mandate of [what] a sound basic education entails” on the testimony of competing experts (id. at 317).[3]
The risks inherent in this novel approach to constitutional adjudication have now been realized.[4] ***The trial court modified the “template” to reflect a “dynamic” understanding of the *951 constitutional imperative that must “evolve” with the changing demands of a modern world (187 Mise 2d 1, 16 [2001]). A sound basic education was expanded to require an “engaged, capable voter” who has the “intellectual tools to evaluate complex issues, such as campaign finance reform, tax policy, and global warming” (id. at 14). Furthermore, the trial court understood our “template” to encompass the opportunity to obtain “productive employment or pursue higher education” (id. at 15). The template was transmuted from a constitutional minimum into “the aspirational, largely subjective standards expressed by the lower courts and the dissent in Levittown, representing what typically one would desire as the outcome of an entire public education process — to produce useful, functioning citizens in a modern society” (CFE I, 86 NY2d at 329 [Levine, J., concurring]).
Today the majority defines a “sound basic education” as “a meaningful high school education, one which prepares [young people] to function productively as civic participants” (majority op at 908). While unimpeachable, what exactly does this supposed refinement of a “sound basic education” mean? Does a “meaningful high school education” entail a high school diploma, requiring completion of the 12th grade? Evidently not, because the majority notes that “a sound basic education should not be pegged to the eighth or ninth grade, or indeed to any particular grade level” (majority op at 906).
This begs the question of how the courts (or the other branches) are expected to figure out whether the majority’s constitutional minimum (i.e., a “sound basic education” defined as a “meaningful high school education” that prepares students “to function productively as civic participants”) has been met if completion of the 12th grade and graduation are irrelevant. Similarly, the majority observes that a “high school level education is now all but indispensable” for employment (majority op at 906), without suggesting how a job applicant establishes that level of competence absent a diploma. Further, if the majority means to imply that some quantum of high school education short of graduation comprises a “meaningful high school education,” how is this measured other than by relating it to completion of some grade level lower than the 12th?
The requirements for a high school diploma are defined by the State Education Department (8 NYCRR 100.5 [2003]). Students who entered ninth grade in 2001-2002 and those thereafter (except students with disabilities) will only be eligible for a high school diploma upon satisfactorily meeting *952 Regents Learning Standards (RLSs) (8 NYCRR 100.5 [a] [3] [2003]). Thus, if a “meaningful high school education” does, in fact, mean a high school diploma, the majority’s standard “cede[s] to a state agency the power to define a constitutional right” (majority op at 907) — a result it emphatically rejects.
Although the majority resists adopting the Regents Learning Standards to define a “sound basic education” or a “meaningful high school education,” the Board of Regents is, in fact, the constitutionally designated education policymaking body in our state. “The adoption of regulations with respect to graduation requirements, including basic competency examinations, to establish a standard that would make a high school diploma in this State a meaningful credential of the graduate, is clearly within the authority and power of [the Board of Regents and Commissioner of Education]” (Matter of Board of Educ. of Northport-E. Northport Union Free School Dist. v Ambach, 90 AD2d 227, 231-232 [3d Dept 1982], affd 60 NY2d 758 [1983]).
Further, the majority offers no objective reference point as an alternative to the Regents Learning Standards. In order to determine whether “inputs” are sufficient to avoid a constitutional violation, the majority must look to “outputs” correlated to an objective reference point.[5] 6 All traditional education ends in assessment: an examination result, grade advancement, or graduation. In short, the majority has articulated a constitutional standard without any way to measure whether it has been (or may be) met.
The “outputs” section of the majority opinion underscores the problematic nature of the constitutional standard of its devising. First, my colleagues “presume [ ] that a dropout has not received a sound basic education” and rely on evidence to support this presumption (majority op at 914). They then observe that between a quarter and half of all dropouts leave after completing four years of high school (majority op at 915 n 7). If dropouts by definition do not receive a “meaningful high school education,” then it logically follows that the recipient of a high *953 school diploma is the only student who does. Students either graduate from high school or drop out — there is no middle ground where a “meaningful high school education” makes any sense.
Next, the majority criticizes the probative value of test results offered by the State on “an assortment of commercially-available nationally-normed reading and math tests administered to children in City elementary schools” because the results were referenced to a norm rather than to achievement levels (majority op at 918). Even though New York City’s elementary school students rank in the middle nationally in terms of the reading and mathematical skills of their peers, the majority views these tests results as irrelevant because “[t]he State has not shown how to translate these results into proof that the schools are delivering a sound basic education, properly defined” (majority op at 918 [emphasis added]). I fail to grasp why scores reflecting a proficiency for New York City students which is equal to, or better than, that of half of their peers nationally still falls short of a constitutional minimum.
Lastly, the majority discounts the Regents Competency Tests (RCTs), the state prerequisite for a “local” high school diploma, because the RCTs assess “an eighth or ninth grade level in reading and a sixth-to-eighth grade level in math” and thus do “not prove that [students] have received a meaningful high school education” (majority op at 917). But students who receive a local diploma have successfully completed the twelfth grade. They simply have not taken Regents exams in their courses.
The indispensable nature of the “outputs” in determining whether the New York City public school system currently or prospectively provides the opportunity for a “meaningful high school education” cannot be overstated. Here, the majority definitively specifies only what the acceptable educational “output” is not. It is definitely not the RCTs, which are being phased out in favor of the RLSs, because they are insufficiently ambitious to comport with modern-day understandings of what a sound basic education encompasses (and, if measured by the RCTs, the New York City public school system does not violate the quality standard of the Education Article). But the majority also balks at adopting the RLSs, which represent too ambitious a minimum at present for the ever-evolving constitutional principle at stake. In any event, the RLSs are not a proper constitutional standard because they may bend, grow or retreat at the will of a state agency.
*954 The majority’s dilemma is easy to appreciate. Recognizing the Judiciary’s limitations as an education policymaker, my colleagues are reluctant to create a detailed quality standard by which to define the State’s obligation under the Education Article. But they are also unwilling to cede to the Board of Regents and the State Education Department the power to define (and, in the future, redefine) what is claimed to be a constitutional principle (albeit a dynamic one), not an education policy decision. As a result, the standard that the majority has created — a “meaningful high school education” that prepares students “to function productively as civic participants” — is illusory. It surely is no more definite than the template enunciated for a “sound basic education” in CFE I, unless, of course, the majority, in fact, intends to equate a “meaningful high school education” with a high school diploma. In that event, my colleagues have, as a practical matter, adopted the RLSs and the Regents diploma as defining the constitutional minimum — for the present.[6]
Causation
In Levittown, we had “no difficulty in determining that the constitutional requirement [was] being met” by virtue of the State’s substantial financial contribution to education alone, which placed New York third among the states in per-pupil expenditures (see Levittown, 57 NY2d at 48).[7] New York still spends more on state aid for education than all but two states in the nation, although New York has lost its rank as the second most populous state in the 20 years since Levittown.
In 2002-2003, the Legislature disbursed $12.3 billion from the General Fund for public education statewide. This represented almost 31% of all General Fund disbursements for the *955 fiscal year. Moreover, the State’s contribution to the New York City school system has markedly increased over the past several years, from $3.1 billion in fiscal year 1993-1994 to $4.5 billion in fiscal year 1999-2000 to more than $5 billion in fiscal year 2002-2003. As the State’s contributions have increased, the City has not kept pace. As a result, from fiscal year 1994-1995 to fiscal year 1999-2000, the State’s share of the City’s combined state and local education funding increased from 47% to 51% (approximately 10% of the City’s education budget consists of federal funds). Concomitantly, the City’s share decreased from 53% in 1995-1996 to 49% in 1999-2000.
In 1999-2000, the school year during which the trial in this case ended, the Board of Education received more than $10.4 billion from all sources to operate New York City’s public schools, amounting to $9,500 per pupil. Between 1997, when the Board’s budget was $8.1 billion, and 2000, pupil spending increased by 20% even after adjusting for inflation. The City reports its current school year overall budget to have risen to $12.4 billion, or $11,300 per enrolled student. In addition to its operating budget, the Board’s capital plan at the time of trial provided over $7 billion in funding for new school facilities and repairs to existing facilities.
In short, very substantial sums are spent on New York City’s public schools. If it were counted as a state, New York City would rank fifth in per-pupil expenditures; it would rank ninth if spending were adjusted for cost-of-living differences. Again, the State contributes about half of these very substantial sums.
The plaintiffs originally complained that New York City’s public schools were necessarily underfunded by the State because they enrolled 37% of the State’s public school population but received slightly less than 35% of the total state aid distributed. Addressing this point in CFE I, Judge Simons in his dissent pointed out that “[t]here is no constitutional requirement * * * that the State maintain exact parity in the financial aid distributed to the several thousand school districts” (CFE 1, 86 NY2d at 340). In any event, for the 2002-2003 school year, the City enrolled 37% of the State’s public school population and was allocated 37% of the combined major aid enacted (see New York State Division of the Budget, Education Unit, Description of 2002-03 New York State School Aid Programs, at 35, table II-E).
In this lawsuit, plaintiffs assert that the Education Article establishes a particular quality standard, and that New York *956 City’s public schools do not offer students the opportunity for an education that meets this quality standard. Plaintiffs then argue that the reason for this failure is necessarily inadequate state funding, even though the New York City public school system receives substantial school aid and has benefitted from huge increases in school aid over the life of this litigation. Plaintiffs’ proof of a causal link amounts to nothing more than an article of faith: the New York City public school system is not what we would like it to be or what it needs to be, and more money is always better; therefore, the system’s shortcomings are attributable to inadequate funding, for which the State is necessarily responsible because of the obligation placed upon it by the Education Article. As the Appellate Division recognized, this is not proof of a causal connection, it is a recipe for “limitless litigation” (295 AD2d 1, 9 [2002]). Moreover, I would not expect this “limitless litigation” to be confined to litigants concerned about New York City’s public schools. The success of plaintiffs’ theory here will no doubt inspire a host of future litigants representing other communities and school districts throughout the State.[8]
In fact, of course, educational deficiencies are not always attributable to the lack of money or necessarily cured by the infusion of more funds.[9] A wide variety of nonfinancial factors (not to mention socioeconomic factors) may contribute to academic failure, including mismanagement, excessive administration, misassigned teachers, misplaced spending priorities, outright corruption, and an improper emphasis on some programs.
For example, the majority points to excessive class size as a measurably deficient “input.” Certainly, the Board of Education might hire more teachers if increased funds were made available for this purpose. Class size, however, is also a func *957 tion of how the Board deploys its teachers. Before their recently negotiated collective bargaining agreement, the City’s teachers had a shorter contractual teaching day than was the case in any other school district in the state or in other large urban districts across the nation. New York City has one teacher for every 14.1 students, placing it in the top 10% of large districts across the nation. By comparison, Los Angeles, the second largest school system in the nation, has one teacher for every 20.8 students.
Further, the Board of Education employs thousands of teachers who are not assigned classroom teaching duties.[10] Thus, although the City employs roughly the same number of teachers per student as the rest of the state, its class sizes are much larger.
Nor does additional funding for more teachers or increased teacher pay neatly translate into the assignment of more qualified teaching staff to the “worst” schools. For example, the record clearly established that the most inexperienced teachers are routinely placed in the “worst” schools. This situation is likely to persist, regardless of the number of teachers or their pay, so long as the collective bargaining agreement between the teachers’ union and the school district allows more experienced teachers to opt out to “better” schools.
Remedy
The majority first directs the State to determine the actual cost of a “sound basic education” and to ensure that every school in New York City has the necessary funding to meet the standard, and sets a deadline. The funding level must reflect the cost of a “sound basic education” that is not tied to anything other than a “meaningful high school education.” The majority also remands the case to the trial court to review the Legislature’s efforts to determine if under the new funding scheme “inputs and outputs improve to a constitutionally acceptable level” (majority op at 930).
*958 This remedy is extraordinary, if not unprecedented. Having determined that the State is not satisfying its constitutional obligation with respect to the education of New York City’s public schoolchildren, we should — as the State requests— simply specify the constitutional deficiencies. It is up to the Legislature, as the entity charged with primary responsibility under the Education Article for maintaining the State’s system of public education, and the Executive, who shares responsibility with the Legislature, to implement a remedy. This lawsuit should be at an end. Instead, the majority, observing that “the political process allocates to City schools a share of state aid that does not bear a perceptible relation to the needs of City students” (majority op at 930), casts the courts in the role of judicial overseer of the Legislature. This disregards the prudential bounds of the judicial function, if not the separation of powers.
Moreover, as soon as the trial court is called upon to evaluate the cost and effectiveness of whatever new programs are devised and funded to meet the needs of New York City’s schoolchildren, the education policy debate will begin anew in another long trial followed by lengthy appeals. The success of the new funding mechanism will then be tested by outputs (proficiency levels). This dispute, like its counterparts elsewhere, is destined to last for decades,[11] **V,and, as previously noted, is virtually guaranteed to spawn similar lawsuits throughout the state.
Our remedy also signals the demise of local control, a key component to the constitutionalization of New York’s public school system. Long before the Education Article’s adoption in 1894, New Yorkers were free to require their local schools to *959 provide more than a minimal education. As Levittown instructs, this may be done without offending the Constitution. Nonetheless, by constitutionalizing what we would like our children to learn and making the State solely responsible for ensuring that this standard is met, we have severely undercut local control. We have centralized responsibility for educational competence (not constitutional compliance) in the courts and their anticipated “dialogue” with the Legislature.
Conclusion
Trial judges and appellate courts are well suited to assess criminal responsibility in accordance with prescribed procedures; to assign liability for breaches of duty; to extrapolate legislative intent; or to interpret commercial agreements. Each dispute is based on fact and law. They are not, however, well suited to make the subtle judgments inherent in education policymaking, or to assess how the State of New York may best allocate its limited resources to meet its citizens’ educational and other pressing needs.
Of course, the majority sincerely sees itself as interpreting constitutional commands, a proper and solemn judicial function, not as making policy choices and value judgments constitutionally committed to the other branches of government. In my view, however, by this decision, the majority has allowed its deep sympathy for educational excellence to overwhelm its sense of the proper and practical limits of the judicial function.
Accordingly, I would affirm the decision of the Appellate Division, and dismiss plaintiffs’ complaint.
Judges Smith, Ciparick and Rosenblatt concur with Chief Judge Kaye; Judge Smith concurs in a separate concurring opinion; Judge Read dissents in another opinion; Judge Graffeo taking no part.
Order modified, etc.

. New York is one of 15 states whose constitutions’ express terms impose an educational obligation to maintain a system of free public schools, but nothing more (see William E. Thro, Note, To Render Them Safe: The Analysis of State Constitutional Provisions In Public School Finance Reform Litigation, 75 Va L Rev 1639, 1661-1670, 1662 n 109 [1989]). By contrast, 19 state constitutions mandate a system of public schools meeting an articulated standard of quality such as “thorough and efficient”; eight state constitutions contain a stronger and more specific educational mandate and purposive preambles; and seven state constitutions impose the greatest obligation on the state legislature by providing that education is “fundamental,” “primary” or “paramount” (see id.; see also William E. Thro, School Finance Reform, A New Approach to State Constitutional Analysis in School Finance Litigation, 14 J L & Pol 525 [Summer 1998]).

. The parties identified and deposed 30 expert witnesses prior to the trial, which featured 72 witnesses and consumed 111 court days over a seven-month period.

. In assessing the role of expert testimony at the trial in this case, one commentator has remarked that “[i]n many cases, the academic literature is divided on an issue, so the Court took one side” (Clive R Belfield and Henry M. Levin, The Economics of Education on Judgment Day, 28 J Educ Fin 183, 185 [Fall 2002]). Of course, trial courts do this all the time, but usually not when determining what a constitutional standard means or whether it has been violated.

. These risks were recognized at the time by Judge Levine, who concurred in CFE I, and by Judge Simons, who dissented. Judge Levine carefully tracked the trial and intermediate appellate progress of Levittown. He noted that both lower courts had found violations of the Education Article by applying constitutional standards remarkably similar to the template announced by the majority in CFE I, yet in Levittown we held as a matter of law that plaintiffs and intervenors had not established a constitutional violation. Judge Levine worried that the majority’s interpretation of the Education Article might be read to reject Levittown so as to “invite[ ] and inevitably * * * entail the subjective, unverifiable educational policy making by Judges, unreviewable on any principled basis” (CFE I, 86 NY2d at 332). Judge Simons harbored no doubt that the majority had strayed from Levittown, observing that “[o]f course, the majority may interpret the State Constitution, or our Levittown decision, as mandating a level of student performance and authorizing judicial determination of the curriculum and facilities and State funding necessary to achieve that level if it chooses, but I believe it unwise to do so * * *” (id. at 341).

. In Paynter v State of New York (100 NY2d 434, 441 [2003] [decided today]), we observe that “[t]he causes of academic failure may be manifold, including such factors as the lack of family supports and health care. But if the State truly puts adequate resources into the classroom, it satisfies its constitutional promise under the Education Article, even though student performance remains substandard” (emphasis supplied). If “outputs” are irrelevant as long as funding is adequate, it seems inconsistent for the majority here to look to the same outputs to measure whether the “sound basic education” standard has been met in the first place.

. Judge Smith, of course, straightforwardly embraces the RLSs.

. This stands in marked contrast to Kentucky, the state always cited as the success story for school finance reform litigation (see Rose v Council for Better Educ., Inc., 790 SW2d 186 [Ky 1989]). In the 1980’s Kentucky ranked forty-eighth among the states in per pupil and per capita expenditures on public schools (see Molly A. Hunter, All Eyes Forward: Public Engagement and Educational Reform in Kentucky, 28 J L & Educ 485 [Oct. 1999]). In the 1980’s Kentucky also “was fiftieth among the states in adult literacy and adults with high school diplomas, [and] forty-ninth in college-going rate * * *. U]n the Appalachian counties over 48% of the population was functionally illiterate” (id. at 486). The Kentucky Supreme Court in Rose declared the State’s entire statutory framework for the common schools unconstitutional; that is, for example, statutes or regulations bearing on teacher certification as well as those bearing on finance.

. For this reason as well as the sheer relative size of the New York City school district, I view the majority’s forbearance from a statewide remedy, which Judge Smith would straightforwardly adopt, as illusory in practical effect as is the majority’s standard to define a sound basic education.

. Paynter is instructive on the point of whether increased funding is a panacea for poor educational outcomes. According to the Paynter plaintiffs at oral argument, the Rochester City School District has had the highest paid teachers in the state since 1997, all of whom are certified, as well as new buildings and books, yet graduates only 26% of its students. Thus the Paynter plaintiffs claimed no funding inadequacy. The Rochester City School District, however, filed an amicus curiae brief on this appeal, stating that it “continues to suffer from grossly inadequate State and local funding” (brief at 16).

. For example, as part of a comprehensive effort to improve special education, “long * * * the source of the most intractable and costly of the city’s education ills,” the Chancellor plans to streamline the screening process by eliminating an additional review at the school district level, which would free up 960 educational evaluators for teaching at least half-time (David M. Herszenhom, Bloomberg and Klein Have Plan to Improve Special Education, New York Times, Apr. 4, 2003, at D7, col 1). The New York City public school system devotes at least a quarter of its budget to special education.

. This type of litigation does not appear on a “blank slate” in terms of our national experience (see, e.g., Robinson v Cahill, 62 NJ 473, 303 A2d 273 [1973]; Robinson II, 63 NJ 196, 306 A2d 65 [1973]; Robinson III, 67 NJ 35, 335 A2d 6 [1975]; Robinson IV, 69 NJ 133, 351 A2d 713 [1975]; Robinson V, 69 NJ 449, 355 A2d 129 [1976]; Robinson VI, 70 NJ 155, 358 A2d 457 [1976], mod 70 NJ 464, 360 A2d 400 [1976]; Abbott v Burke, 100 NJ 269, 495 A2d 376 [1985]; Abbott II, 119 NJ 287, 575 A2d 359 [1990]; Abbott III, 136 NJ 444, 643 A2d 575 [1994]; Abbott IV, 149 NJ 145, 693 A2d 417 [1997]; Abbott V, 153 NJ 480, 710 A2d 450 [1998]; Abbott VI, 163 NJ 95, 748 A2d 82 [2000], clarified by Abbott VII, 164 NJ 84, 751 A2d 1032 [2000]; Abbott VIII, 170 NJ 537, 790 A2d 842 [2002]; Abbott IX, 172 NJ 294, 798 A2d 602 [2002]; DeRolph v State, 78 Ohio St 3d 193, 677 NE2d 733 [1997]; DeRolph II, 89 Ohio St 3d 1, 728 NE2d 993 [2000]; DeRolph III, 93 Ohio St 3d 309, 754 NE2d 1184 [2001]; DeRolph IV, 97 Ohio St 3d 434, 780 NE2d 529 [2002]; DeRolph V [sub nom. State ex rel. State v Lewis], 99 Ohio St 3d 97, 789 NE2d 195 [2003]).